## The State v. Sattley, *Appellant.*

### Division Two, December 3, 1895.

1. **Constitution**: CRIMINAL LAW: LEGISLATURE. Where the constitution provides that the commission of certain acts shall be a crime "the nature and punishment of which shall be prescribed by law," there is no offense until the legislature acts.

2. ——: ——: STATUTE: BANK: OFFICER. Revised Statutes, 1889, section 3581, providing that any bank officer who shall receive or assent to the reception of a deposit, or who shall create or assent to the creation of any indebtedness by the bank, knowing that it is in a failing condition, shall be guilty of larceny and shall be punished as provided by law for stealing the same amount of money, etc., sufficiently prescribes the nature and constituents of the crime as required by the constitution. (Art. 12, sec. 27.)

3. **Criminal Law**: LARCENY: STATUTE. The legislature in defining larceny is not restricted to the acts constituting it at common law.

4. ——: INDICTMENT: BANK: OFFICER: STATUTE. An indictment under Revised Statutes, 1889, section 3581, charging a bank officer with receiving deposits knowing that the bank was insolvent, is not subject to the objection of repugnancy because each count concludes with the words, "did steal, take, and carry away."

5. ——: ——: ——: STATUTE. An indebtedness of the bank created by the receipt of a deposit and the issuance of a certificate therefor is one within the meaning of said section 3581, Revised Statutes, 1889.

6. ——: BANK: EVIDENCE. On the question of the value of the assets of an insolvent bank, the testimony of the assignee who had spent a year in ascertaining their worth and of the appraisers who had employed forty-three days in personally examining every asset in the schedule was admissible; it appearing that the witnesses had been in the banking or real estate business in the city where the property was situated for many years and that they were conversant with property values there.

7. **Appellate Practice**: BILL OF EXCEPTIONS: DOCUMENTARY EVIDENCE. Where copies of documents, concerning which witnesses were examined, are not preserved in the bill of exceptions, objections to their testimony in reference thereto will not be considered on appeal.

8. **Criminal Practice**: BANK, OFFICER RECEIVING DEPOSITS KNOWING IT TO BE INSOLVENT: EVIDENCE. On the trial of a bank-officer for receiving deposits knowing that the bank was insolvent, evidence that depositors demanded their money, and of the refusal of the bank employees to pay them, is competent to show the failure of the bank to meet its obligations in the ordinary course of business, and this is true whether the defendant personally heard the demands or not.

9. ———: ———: ———: ———. On the issue as to the value of certain stock held by a bank at the date of its assignment, the court rightly refused to permit a witness to state the value of a building owned by the corporation, founded on his knowledge of its cost.

10. ———: ———: ———: ———. It having been shown that the stock had a value, the inquiry, at most, should have been limited to the market value of the real estate at the time of the bank's assignment.

11. ———: ———: ———: ———. Evidence of the value of a corporation's realty is competent to show the value of its stock only in the absence of better evidence.

12. ———: ———: ———: ———: INDICTMENT. An indictment under Revised Statutes, 1889, section 3581, against a bank officer for receiving a deposit knowing that the bank was insolvent properly lays the ownership of the money in one who as president and member of a voluntary charitable association made the deposit with the bank.

13. ———: INSTRUCTIONS. Ordinary plain English words used in instructions are not required to be defined.

14. **Criminal Law**: BANK, OFFICER RECEIVING DEPOSITS AFTER IT IS INSOLVENT: AGENCY. Whenever an officer of a bank becomes aware of its failing condition it is his duty to revoke the authority of any employee, under him and subject to his authority, to receive any further deposits; and his failure to do so will be construed as a continuing authority to receive them and as assenting thereto, and will subject him to the penalties of Revised Statutes, 1889, section 3581.

15. ———: ———: ———: INSTRUCTION. An instruction on the trial of an officer of a bank indicted under the foregoing section, that the failure of the bank "is *prima facie* evidence of the knowledge on the part of its cashier that the same was in failing circumstances," with an explanation that "*prima facie* evidence is such that raises such a degree of probability in its favor that it must prevail unless it be rebutted or the contrary be proved," is not erroneous. (*State v. Buck*, 120 Mo. 479.)

16. ———: ———: ———: VERDICT. Where the indictment in such case contains a count for receiving a deposit knowing that the bank was in a failing condition and another count for assenting to the creation of the indebtedness by the bank, and the evidence shows but one transaction which consisted in receiving a deposit and issuing a certificate therefor, a general verdict of guilty, without specifying on which count, is sufficient.

*Appeal from Jackson Criminal Court.*—HON. JOHN W. WOFFORD, Judge.

AFFIRMED.

*Adiel Sherwood, Warner, Dean, Gibson & McLeod, Gates & Wallace, Harkless & O'Grady* and *Beebe & Watson* for appellant.

(1) The indictment is bad in that it contains two counts, each of said counts being repugnant to, and inconsistent with, the other. (2) The court erred in refusing to sustain the demurrer to the state's evidence. There was a fatal variance between the descriptive averments of the indictment and the proof. (3) *First.* The court erred in holding that witnesses Moore, Holden, and Coppinger were competent experts as to value of assets of the bank. Rogers on Expert Testimony, secs. 24, 30, 34, and 36; *Heald v. Thing*, 45 Me. 394; *Greeley v. Stilson*, 27 Mich. 155; *Polk v. State*, 36 Ark. 124; *Railroad v. Shipley*, 39 Md. 251; *Dickinson v. Fitchburg*, 13 Gray, 556; *State v. Meyers*, 54 Kan. 214. *Second.* The court erred in permitting the witnesses Moore, Holden, and Coppinger, to state certain debtors of the bank were insolvent. This was a mere conclusion of witnesses. *State v. Meyers*, 54 Kan. 214; *Brundred v. Mach. Co.*, 4 N. J. E. 295. *Third.* The court erred in refusing to allow defendant, on cross-examination of witnesses Moore, Holden, and Coppinger, to show the market value of the property of American Bank Build-

ing Company, Exchange Building, Realty Investment Company, and other corporations, for the purpose of proving the value of the stock of such companies. This was competent. *Hewitt v. Steele*, 118 Mo. 463; 1 Spelling on Private Corporations, sec. 499; *Freon v. Carriage Co.*, 42 Ohio St. 30; Cook on Stock and Stockholders, sec. 581.  (4)  The court erred in admitting evidence of depositors of the bank as to what was done and said with bank officers at time of deposit, when defendant was not present.  *First.*  Because it was hearsay evidence against defendant.  *Second.*  Because it was not competent to prove any issue in the case. 3 Rice on Evidence, pp. 218 and 743, cases cited; Roscoe's Crim. Evid., secs. 90 and 94; *State v. Jackson*, 95 Mo. 699.  (5)  The court erred in excluding the testimony of W. F. Reed, offered by defendant to prove the construction of the Kansas statute.  *Hoes v. Van Alstyne*, 20 Ill. 202.  (6)  *First.*  The court erred in giving instruction number 6 on behalf of the state, because there was no evidence on which to base same. *Second.*  The court erred in giving instruction number 7 on behalf of the state.  (*a*)  Because it is in violation of section 4220, Revised Statutes, in that it tells the jury what weight shall be given certain facts.  (*b*)  Said instruction does not properly declare the law.  *Green v. State*, 13 Mo. 382; *State v. Wisdom*, 119 Mo. 552.  *Third.* Instruction number 9 should not have been given. (*a*)  If the property charged to have been received into the bank was not that of Christina Vogt, then there was a fatal variance, and the instruction is erroneous for that reason.  (*b*)  It is a comment on the evidence, and is in conflict with section 4220 Revised Statutes, 1889.  *Fourth.*  Instruction 10 is subject to same objections as made to number 9.  *Fifth.*  Instruction number 12 is also in conflict with instruction 10 and subject to same objection as made to numbers 9 and

10. *Sixth.* Instructions 11 and 13 are mere comments on the evidence and should not have been given. *Seventh.* Instruction 14 is erroneous. (*a*) Because it does not define the word "assenting to the reception of a deposit." This was the essence of the crime charged and the same should have been defined. *State ex rel. v. Brassfield*, 67 Mo. 339. This instruction wholly ignores any "guilty intent." There can be no crime where there is no guilty intent. Bishop's New Crim. Law, secs. 285 and 287, and cases cited. *Eighth.* Instructions 15 and 16, given for the state, are subject to same criticism made to instructions 12, 13, and 14. *Ninth.* Instruction 17 given is erroneous. (*a*) Because unconstitutional. (*b*) Because it is an improper declaration of law, in that the statute only makes such evidence *prima facie* in the absence of proof to the contrary. This qualification should have been added. *Com v. Williams*, 6 Gray, 1; 3 Rice on Evidence, sec. 27, and cases cited; *State v. Ogletree*, 28 Ala. 693; *State v. Evans*, 124 Mo. 411. (*c*) The instruction takes away the presumption of the innocence of defendant on the selected facts only. This was erroneous. *State v. Ogletree, supra.* (*d*) It casts on defendant the burden of proving the contrary—that is, establish the truth of the contrary. Rapalje & Lawrence Law Dict.; Best on Evidence, sec. 9. Whereas, all defendant is required to do was to prove such facts as would raise a reasonable doubt, therefore this instruction was erroneous. (*e*) This instruction violates section 4220, Revised Statutes, 1889. *Tenth.* Instruction number 19 is erroneous in that the latter part of same is a mere comment on the evidence and violates the statute *supra*. *Eleventh.* Instructions 20 and 21 are subject to the same criticisms made to instructions 12, 14, 15, and 16. (7) The court erred in refusing to give all the instructions asked by defendant.

*R. F. Walker*, attorney general, *Morton Jourdan*, assistant attorney general, *Marcy K. Brown*, prosecuting attorney, and *Frank G. Johnson*, assistant prosecuting attorney, for the state.

(1) The indictment is sufficient (see section 3581, R. S. 1889). The second count is an almost exact copy of the indictment in *State v. Buck*, 108 Mo. 622, and *State v. Buck*, 120 Mo. 483, 484. The third count is practically the same as the second, except that it charges the creation of an indebtedness. The indictments in the above cases were carefully considered and approved by this court. (2) The evidence fully supports the verdict. It has been repeatedly held that this court will not interfere, unless it affirmatively appears that there is a total failure of proof. *State v. Fisher*, 124 Mo. 460; *State v. Schaeffer*, 116 Mo. 96; *State v. Cook*, 58 Mo. 548. (3) Where an inference of guilt may reasonably be drawn from the testimony, a verdict will not be set aside on appeal because of the insufficiency of the evidence. *State v. Sanford*, 124 Mo. 484; *State v. Banks*, 118 Mo. 107; *State v. Cantlin*, 118 Mo. 100. (4) Where the evidence does not so preponderate against the verdict as to justify the court in concluding that the jury were influenced by passion or prejudice, the objection that the verdict is against the evidence must be overruled. *State v. Preston*, 77 Mo. 294; *State v Moxley*, 115 Mo. 644; *State v. Richardson*, 117 Mo. 585; *State v. Alfray*, 124 Mo. 393. (5) No error was committed by the court in admitting the testimony of witnesses John A. Moore, Mark Coppinger, and Howard M. Holden, as to the value of the assets of the bank, as showing the condition of the bank, as to its insolvency on the tenth of July, 1893, the date upon which the deposit was

received. The witnesses were shown by the evidence to be qualified and competent to testify as to the values of the assets of the bank, and witnesses may testify as to their value in bulk. *Seyforth v. Railroad*, 52 Mo. 452. (6) Opinion evidence as to the value of property involved in any litigation is, of necessity, admissible. *Dalzell v. Davenport*, 12 Iowa, 437. (7) Opinions of witnesses acquainted with real estate, the value of which is in dispute, are competent upon the question of such value. *Clark v. Baird*, 9 N. Y. 183; *Ferguson v. Stafford*, 33 Ind. 162; *Railroad v. Windsor*, 51 Ind. 238. (8) "It is no objection to the evidence of a witness testifying as to market value that such evidence rests on hearsay. So it is admissible to fall back, as a basis of opinion, on prices current, provided they be traceable to reliable sources." *Seligman v. Rogers*, 113 Mo. 657; Wharton's Evidence, sec. 449, and cases cited; *Cliquot's Champagne*, 3 Wall. (U. S.) 414; *Chaffee v. United States*, 18 Wall. 541; *Terry v. McNeill*, 58 Barb. 241. (9) Insolvency may be shown in various ways. "A judgment and execution unsatisfied are evidence of insolvency, or inability to collect. They are, however, evidence only, and the facts may be established as well by other evidence; among other modes, by assignment and continued suspension of business, or other notorious indication." *Terry v. Tubman*, 2 Otto, 156; *Reynolds v. Douglas*, 12 Pet. 497; *Lent v. Paddelford*, 2 Am. L. Cases, 134. (10) Any declaration made at the time of receiving the deposit by the defendant, or by the person who received the deposit, in the presence of defendant, or made by his direction, in regard to the bank's solvency, is admissible to show knowledge, and as part of the *res gestae*. *State v. Ware*, 62 Mo. 597; *State v. Evans*, 65 Mo. 574; *Robinson v. Walton*, 58 Mo. 380. (11) All the twenty-two refused instructions asked by defendant were

properly refused by the trial court. The declarations of law asked for in numbers 6, 7, 15, 16, 17, 18, and 19 were, so far as proper, contained in the instructions given, and were, therefore, unnecessary, and it was not error to refuse them. *State v. Luke*, 104 Mo. 563; *Buck v. Street Railway Co.*, 108 Mo. 179; *State v. Banks*, 118 Mo. 117; *State v. Morton*, 42 Mo. App. 64; *State v. McKenzie*, 102 Mo. 620. (12) The instructions given properly declared the law and covered every phase of the case.

GANTT, P. J.—The defendant was indicted in the criminal court of Jackson county, at Kansas City, at the September term, 1893, for grand larceny, under section 3581, Revised Statutes, 1889, for having, as cashier of the Kansas City Safe Deposit and Savings Bank, unlawfully and feloniously received a deposit of $300, the property of Mrs. Christina Vogt, when said bank was in failing circumstances, after he had knowledge it was in that condition, and, in another count, for having assented to the creation of an indebtedness by said bank issuing to said Christina Vogt a certificate of deposit for said $300, payable to the order of Mrs. Mary Seitzler or Mrs. E. Vogt, due six months after the date thereof, to wit, July 10, 1893, and bearing five per cent interest until maturity.

Defendant was duly arraigned, and entered a plea of "not guilty." After a change of venue to Independence, the cause was finally tried in July, 1894, and the defendant convicted and sentenced to the penitentiary for a term of four years. Though sentenced by the court in August, 1894, the transcript of this appeal was not filed in this court until April 29, 1895, too late for a hearing at the April term. Such delays are inexcusable. We again call the attention of the circuit and

criminal courts to this dilatory practice. It is fast becoming a reproach to the administration of the law.

The Kansas City Safe Deposit and Savings Bank was organized in March, 1883, with a capital stock of $50,000. The defendant, Sattley, was one of its officers and a member of its board of directors from 1886 continuously until it failed and made an assignment for the benefit of its creditors on July 10, 1893. For seven years prior to its collapse defendant was cashier of the bank, and, together with the president thereof, had actual, absolute control of its affairs. H. P. Churchill was president until 1891, when he was succeeded by J. C. Darragh, who continued as president until the failure on July 10, 1893.

The by-laws, to which the witnesses for the state and defendant both very often refer in their testimony, are not preserved in the bill of exceptions, and much of the statements of counsel as to what said by-laws would establish can not be substantiated by the record or considered in making up our judgment. The bill of exceptions recites that it contains "all the oral testimony given and offered upon the trial," "but does not include copies of documentary evidence, introduced and offered and admitted in said cause, but it contains a statement and description of each piece of documentary evidence." The reports of the bank officers to the secretary of the state, some six in number, upon which pages of the oral testimony is based, and without which we can form no adequate idea of the effect of such evidence or the rulings of the trial court thereon, are entirely omitted. The so-called abstract of the evidence is not indexed, and we have been put to much unnecessary and fruitless labor endeavoring to corroborate points made by counsel by reference to the record. Knowing as we do the ability of the counsel who prepared this bill, and having had on other occa-

sions so many proofs of their ability and industry in preparing statements and abstracts for this court, we are greatly surprised at the lax and unsatisfactory condition of this abstract.

The business of the institution was that of a savings bank, the bulk of the deposits being by the poorer classes, sewing women, servant girls, washer women, mechanics, and day laborers.  The bank kept open every Saturday and Monday night until 8 ò'clock in order to receive the earnings and small savings of laborers.  When it closed its doors on July 10, 1893, it had only $11,000 in cash in its vaults, whereas its liabilities aggregated $2,039,068, having, in other words, less than one half of one per cent of its liabilities to its depositors on hand in cash.  The bank had been greatly crippled by a run on it in 1891.

The officers of the bank seem to have conducted it without any regard whatever for the safety of their depositors.   The defendant Sattley was indebted directly and indirectly to the bank in the sum of $85,000, for which the bank held securities worth about $5,000. The president, Darragh, directly and by way of indorsement, owed the bank $164,000, with security worth about $96,000.   But the most glaring of all the schemes for swallowing up the money of the depositors were the transactions with the Realty Investment Company. This institution was organized in Kansas City, January 25, 1890, with a nominal capital of $100,000.   Sattley was the secretary and treasurer of this realty company and a young clerk in the employ of the bank was its president.   The office of this company was in a small room over the bank.

By the manipulation of Sattley with the assistance of Darragh $416,400 of the bank's money was turned over to this realty company and when the bank collapsed all the security it had was some property which

was assessed at $63,250, a loss exceeding by $50,000 the total capital stock of the bank. Under defendant's management the bank had absorbed nine hundred and ninety-seven shares of the one thousand shares of the capital stock of the realty company and this stock which nominally represented $99,700 was absolutely worthless on July 10, 1893. Insolvent as that company was the defendant and the president Darragh permitted it to borrow of the bank's funds upon its unsecured paper and within the six months preceding the failure of the bank $223,824.

| | |
|---|---:|
| On January 3, 1893, loaned. | $ 6,800 |
| February 1, 1893, loaned | 30,000 |
| February 1, 1893, loaned | 30,000 |
| April 1, 1893, loaned | 20,000 |
| April 1, 1893, loaned | 20,000 |
| April 26, 1893, loaned | 50,000 |
| May 1, 1893, loaned | 27,000 |
| May 1, 1893, loaned | 8,210 |
| May 1, 1893, loaned | 20,317 |
| May 13, 1893, loaned | 11,000 |
| May 22, 1893, loaned | 497 |
| Total (without security) | $223,824 |

All that the assignee, Holden, could find to apply on the $50,000 note of April 26, 1893, was a second-hand office desk which netted $15 and was credited on the note, leaving all of said unsecured note a total loss to the bank and its depositors.

Another concern, by name the Corbin Investment Company, was used as a conduit to extract the money of the bank and resulted in a loss of $44,000.

This character of evidence was admitted to show that these transactions leading up to the insolvency and ruin of the bank were directed and executed by the aid and assistance of defendant, and that he could not be ignorant of the true condition of the bank.

But it was shown, further, that just prior to the assignment, on April 28, 1893, the bank owned $83,000

worth of Pine Bluff Water and Light Company's receiver's certificates and sent them to the Equitable Mortgage Company, in New York, for collection. They were collected at once but no returns were ever made to the bank until July 5, 1893, just five days before the assignment, when this claim was settled by simply charging it up to the Equitable Mortgage Company, a concern which had overdrawn $23,000 of the bank's money, and on that date the defendant and Darragh accepted of the Equitable Mortgage Company stock of the bank of the nominal value of $60,000 at its face value, when in truth and fact it would seem it was without value and said mortgage company had acquired it without paying anything for it.

It was also shown that W. P. Moores was the vice president of this bank. He had made a trip to the east to obtain money to tide over the bank, but had failed. The bank was indebted to Moores and his relatives on time deposits to the amount of $42,178. Moores on his return from the east demanded this money, but not having it the president and the cashier picked out the choicest securities held by the bank and on July 5, 1893, turned them over to Moores in settlement of his claims.

But it was in evidence, further, that while the bank was thus preferring its vice president, poor and needy depositors were trying in vain to get their money upon exactly similar certificates. On June 13, 1893, about one month before Mrs. Vogt made the deposit described in the indictment, the bank gave notice it would not pay money on checks, unless ninety days' notice was given. Of course it could not limit its liability on time certificates of deposit. They were payable absolutely when they fell due.

The bank, notwithstanding its refusal to pay without notice, continued to receive deposits up to the hour

of closing, on July 10, 1893, and it is in evidence that at 3 o'clock that afternoon Mr. Bales, a son of one of the directors, was told of the anticipated assignment by the president and says that they met at the bank about 7:30 o'clock that evening to discuss the matter and the deed of assignment was already drawn by Mr. McLeod, one of the bank's attorneys, and was signed that night with the understanding it was to go on record next morning.

Christina Vogt, who made the deposit upon which the indictment is based, was president of the Bethlehem Ladies' Society, a voluntary association, which was a church society organized by the lady members of a struggling Lutheran church of that name, for charitable work, and for the purpose of accumulating sufficient means to erect a permanent place of worship. The money deposited had been accumulated gradually by the society by the payment of monthly dues by the members, and by holding fairs, festivals, and similar church work. Mrs. Vogt, as a member and officer of the society, was intrusted with the keeping of its funds, and allowed by her husband to devote her time and labor to the work of the society. She had been depositing the savings of the society with the bank for over three years, they having all been merged into one certificate of deposit, for $205, which fell due on July 10, 1893, the very day upon which the assignment was made.

Mrs. Vogt went to the bank on that day about 3 o'clock P. M. to draw the money out, and was refused payment, and was induced by representations made as to the solvency of the bank by the teller, in the presence of defendant, to re-deposit the old certificate, and to deposit in addition thereto on that day the sum of $89 in money, for which a new certificate of deposit was issued by the bank for $300, due in six months

thereafter, at five per cent interest, and made "payable to the order of Mrs. Mary Seitzler or Mrs. E. Vogt"— her husband's name being E. Vogt—and Mrs. Seitzler being an officer also of the same society. *The defendant, Sattley, was present when the money was received and the obligation issued, and himself signed the certificate of deposit as cashier of the bank.*

Stephen Hull, an aged minister, had been saving and depositing in the bank for eleven years; he had a certificate of deposit which fell due on June 16, 1893, and called to collect it on that day. He was going toward the paying teller's window with his certificate, when Sattley intercepted him, headed him off, took him into his private room and begged him not to draw out his money. Finding that Mr. Hull was determined to draw out the money, on account of his suspicions as to the bank's condition, he importuned him in the strongest terms not to draw it out; and in order to deceive him and induce him to allow his money to remain, he assured him in the strongest terms that the bank was perfectly secure, and that it was "as sound as the bank of England," and "the very place for an old man like him to leave his money." Sattley, notwithstanding Mr. Hull insisted that he was greatly in need of it, refused to pay him the $1,000 due; but finally, after much urging, let him have only $35 of the amount due him on his certificate.

Mary Corrigan was a domestic who had saved her earnings for many years until she had accumulated about $600, which was deposited in another savings bank where it was drawing 3 per cent interest, but perfectly secure. Passing by one day she saw the sign out where this bank was bidding five per cent interest for all money deposited. She dropped in and Sattley induced her to draw her savings out of the other bank and deposit them with his. She became uneasy

shortly afterward, and went down a week before they posted up the notice requiring time on book accounts before money could be drawn out.   She saw Sattley and asked to have her savings back, telling him "that she had worked out for the money the best years of her life, and that she valued it as much as her life itself, because she had been saving it slowly for years to pay off a mortgage on her home."   Sattley tried to reassure her by telling her to go home and feel secure that "her money was as safe as if she had it in her own pocket;" but when she finally insisted on having it, as he had agreed to her, he flatly refused to let her draw it out, and her life's saving went with the bank's collapse a short time afterward.

C. A. Stavnon, a manufacturer, on June 10, 1893, who contemplated making a deposit, first had a talk with Sattley to ascertain the bank's condition.   He told Sattley that he had heard some rumors as to the bank's condition, and its methods of doing business.   Sattley laughed at the rumors, and said "the bank was the most solid institution in the country, and that it was safer than any national bank; that the bank never loaned out any money except on gilt-edged security, and didn't take commercial paper, like a national bank, but only loaned out its money on first mortgages; and that the bank was so prosperous that it was paying thirty per cent dividends."   On the strength of Sattley's representations as to the bank's condition, Mr. Stavnon deposited $2,095, the amount for which he had just sold out his business.   A few days afterward the bank posted up its notice refusing to pay out money on book accounts, except on ninety days' notice.   Mr. Stavnon went in again to see Sattley about it, who avoided him; but upon returning a third time he secured an interview; Sattley said "there was not a more solid institution in the country; that they didn't have any security

except what was gilt-edged, and worth several times the amount loaned upon it." When Mr. Stavnon deposited his money, it was with the distinct understanding had with Sattley that he could draw it out at any time; but, nevertheless, Sattley refused to let him draw it out, and gave as their reason for suspending payments to depositors that "they were not going to allow themselves to be bulldozed and run over by them."

Susan Talbott was an aged widow, who sewed for a living; she had been a customer of the bank for several years; she and her daughter sewing and saving and putting their earnings in the bank. On June 22, 1893, she went to the bank to get a draft for $132 cashed, which had been sent to her by her son. Such was the bank's condition that they refused to cash even so small a draft for a known customer of the bank; finally, after a consultation between Sattley and the paying teller, Sattley agreed to cash it for her, provided she would accept only $32 in cash for it, and take the bank's obligation for the remaining $100, due on July 15, 1893, which she did; before which time the bank failed.

Michael O'Sullivan had a certificate of deposit for $3,619, which fell due July 3, 1893, which represented his savings of over twenty years as a street laborer. He went to the bank on the morning of July 3 and asked for the money due him. The paying teller, as usual, acting under instructions, refused to pay it and sent him to Sattley, who took him to Darragh, and they both talked with him for some time in the effort to induce him not to draw out his money, telling him the bank was one of the soundest in the country; finally, when he insisted on having the money due him, they flatly refused to pay him. Mr. O'Sullivan stood upon his rights, told them he must have his

money, and threatened to cause them trouble if they did not pay it to him. They then wanted him to take $800 only, and claimed they could pay him no more, but would fix the rest of it up later on. O'Sullivan, however, insisted strenuously upon having all his money due him, and they finally told him to come back in an hour and they would see if they could pay him. In an hour he returned, and they still endeavored to put him off again, but he still insisted so strenuously upon having his money, or making them trouble if he didn't get it, that Sattley and Darragh, after much consultation between themselves, finally paid him a part only of the money due him by giving him a check on another bank, telling him that was the very best they could do for him, and putting him off for the balance of the money due on his certificate until another time later on, before which time the bank had collapsed.

Nellie Kelley was a young sewing girl, a member of a family of five brothers and sisters, who had been working out and saving their wages and depositing them in the bank together for over seven years. Their certificate of deposit for $3,000, representing their joint savings of all these years, fell due July 1, 1893, nine days before the deposit of Christina Vogt was received. Miss Kelley presented their certificate to the paying teller for payment the day it became due; the teller, as instructed, sent her to Sattley, who referred her to Darragh, telling her to wait until he came in. She waited for a long time, and when Darragh finally came in she had a conversation with him, in Sattley's presence, and asked for the $3,000 due on their certificate of deposit. Darragh asked her if a couple of hundred dollars wouldn't do. She said no; that she wanted it all. He refused to pay her anything that day, telling her to come back on July 5. She went back on July 5 and demanded all of the money due,

but was put off again, and was given only $1,000 of the money due her, and told to come back again in a week for the balance. Before that time the bank assigned, and she never received the balance of $2,000 due to her brothers and sisters and herself.

Mrs. Ida Pinkert had a certificate of deposit for $1,500, which fell due on July 5, 1893, on which day she presented it to the paying teller for payment. The teller, obeying his standing instructions, sent her to Sattley, from whom she demanded her money due. Sattley had her sit down in his office. She waited for half an hour until Darragh came; when he arrived, the two officers, Sattley and Darragh, went into executive session in a private room for another half hour, keeping her waiting, at the end of which time they came in together and told her they could not pay her all the money due her, but could only pay her $500 of that amount. She demanded the full amount which was then due, but Sattley and Darragh told her she would have to wait awhile before they could pay her the rest. She still insisted on the bank paying her the full amount due, but they refused, and told her to come back again in three days. At the end of three days, on July 8, she went back again for the balance of her money due; again the executive board of the bank, composed of its head officers, Sattley and Darragh, went into executive session. At the end of the executive session they came out and announced that the bank was not able to meet its obligation. She strenuously insisted, however, on payment, and again the executive board went into another executive session, keeping her waiting for an hour, at the end of which time Sattley and Darragh emerged therefrom, paid her $250 on the certificate, putting her off for the balance by telling her to come back again in another three days, before which time the bank had assigned.

VOL. 131 mo—31

It was also shown that between 3 o'clock and 5 o'clock of the afternoon of July 10, 1893, the defendant Sattley procured R. J. Boyd, a brother of one of the employees in the bank, to sign a note for $17,850 to the bank.  Boyd owed the bank nothing and Sattley told him he wanted the amount to appear in some other name than his (Sattley's) on the books.  *This note, though executed a few hours only before the assignment, was dated back to June 3, 1893.*

On June 28, 1893, Sattley and Darragh each executed his individual note to· the Realty Investment Company for $20,000 and then had the investment company execute two notes each for $20,000 to the bank and *dated them back to April 1, 1893.*

These transactions were carefully concealed from the other directors and stockholders by the defendant and Darragh.

There was much evidence both for the state and defendant as to the value of the assets of the bank at the time of the failure; that for the state tending to show the assets were worth less than thirty per cent of the bank's liabilities.  Only one dividend of five per cent had been realized after a year's effort.  For the defendant, Darragh and other witnesses placed high valuations upon the realty and equities held by the bank.  There was ample evidence from which the jury could have found, as it did, that the bank was hopelessly insolvent when it assigned.

I.  Various objections are made to the indictment. First, it is said the indictment charges no offense because section 3581, Revised Statutes, 1889, does not *prescribe* the *nature* of the crime which it seeks to punish, as required by section 27, article 12, of the constitution of Missouri.  That section ordains that, "it shall be a crime, the nature and punishment of which shall be prescribed by law, for any president, director,

manager, cashier, or other officer of any banking insti-
tution, to assent to the reception of deposits, or the
creation of debts by such banking institution, after he
shall have had knowledge of the fact that it is insol-
vent, or in failing circumstances; and any such officer,
agent, or manager shall be individually responsible for
such deposits so received, and all such debts so created
with his assent.''

The convention by this section cast upon the legis-
lature the duty of prescribing the nature and punish-
ment of an act which the convention itself had prede-
termined should be a crime. The legislature was
enjoined to define the crime whose constituents were
already pointed out by the convention, and affix the
punishment therefor. Until the legislature performed
this condition precedent there was no offense. *Fusz v.
Spaunhorst*, 67 Mo. 256. But at the regular session in
1877 the general assembly did enact that any president,
director, manager, cashier, or other officer of any bank-
ing institution doing business in this state who receives,
or assents to the reception of any deposit of money or
other valuable thing in such bank or banking institu-
tion, or who shall create or assent to the creation of
any debts or indebtedness by such bank or banking
institution in consideration or by reason of which
indebtedness any money or valuable property shall be
received into such bank or banking institution after he
shall have had knowledge of the fact that it is insolvent
or in failing circumstances, shall be deemed guilty of
larceny and upon conviction thereof shall be punished
in the manner and to the same extent as is provided
by law for stealing the same amount of money deposited
or valuable thing if loss occur by reason of such deposit.
Laws of Missouri, 1877, page 239.

By this enactment the legislature defined the crime
to be of the nature of larceny and provided the same

punishment therefor. This act was added as section 69 (a new section) to chapter 201 of the General Statutes of Missouri, 1865, and so continued until this court held in *State v. Kelsey*, 89 Mo. 623, that said section did not cover the offense if committed by a private bank or banker, when it was at once amended by the act of 1887, page 162, so as to include "the owner, agent, or manager of any private bank or banking institution," as well as incorporated banks and put in the form now found in section 3581. So that the nature, the constituents of the crime, and the punishment therefor, have all been prescribed in said section and the amendments thereto.

Again, it is said that this section is repugnant *to the common law definition of larceny*. If it is meant by this to say that the state of Missouri, through its general assembly, has not the right or power to declare and punish an act as larceny which would not have been larceny at common law then the proposition can not be countenanced for one moment. The state has the power to define offenses against its dignity and well being and is not in any manner restricted by the common law in this respect. Many of the states have made embezzlement larceny. In Georgia it is denominated larceny after trust. This objection is without merit.

It is furthermore objected that each of the counts in the indictment is repugnant to itself because it concludes with the words "did take, steal, and carry away." In following this form the pleader simply complied with a long recognized practice, no doubt originating with the idea that every indictment for larceny, whether at common law or under statutes, should conclude in this manner. Bishop, in commenting on their use in indictments for embezzlement, says: "This allegation is unnecessary, but the practice is to insert it, and it seems to be required by the decisions."

2 Bish. Crim. Proc. [3 Ed.], secs. 315–333; *Hamuel v. State*, 5 Mo. 261; *Com. v. Simpson*, 9 Met. 141; *State v. Adams*, 108 Mo. 208.

And it is urged that this section 3581 is unconstitutional and repugnant to section 1, article 14, of the amendments to the constitution of the United States. The learned counsel has not suggested how this section collides with the federal constitution. Such an objection urged against a statute so just in its provisions and so essential to the protection of those who stand most in need of it, and after its constitutionality had been solemnly affirmed by this court, without one reason, either verbally or in brief, in support of the objection, strikes us as frivolous.

Finally, it is said that the third count is defective in that it does not charge *such an assenting* to the creation of an indebtedness as the statute contemplates. The language is, "if any such officer, * * * shall create or assent to the creation of any debts or indebtedness by any such bank * * * in consideration or by reason of which indebtedness any money or valuable property shall be received into such bank," etc. Now, the charge is that defendant feloniously assented to the creation of a certain indebtedness by said bank, to wit, a certificate of deposit payable to the order of Mrs. Mary Seitzler or Mrs. E. Vogt for $300, six months after July 10, 1893, with interest at five per cent until maturity, in consideration of the creation of which said indebtedness the bank received into its coffers $300 from Mrs. Vogt. It is said the statute contemplates a character of indebtedness other than that which necessarily flows from the receipt of a deposit and the issuance of a certificate therefor. "Any indebtedness" is a very comprehensive expression and we are not to be understood as limiting it to that indebtedness which is created by the deposit, but certainly the phrase as

well as the context will comprehend the debt created by the deposit and the execution and delivery of the certificate of deposit in this case. There is nothing in *Kahn v. Bank*, 70 Mo. 262, militating against this view.

II. An immense amount of testimony was taken during the trial as to the value of the assets of the bank. The state seems to have relied principally upon the evidence of the appraisers appointed by the circuit court and the assignee, Howard M. Holden. It is assigned as error that these parties were permitted to testify as experts when they had not qualified as such. This contention is not supported by the record.

Mr. Coppinger, one of the appraisers, testified that he had been president of the First National Bank of Gunnison for the principal part of four years; prior to that time had been bookkeeper and assistant cashier of a bank at Holden, Missouri; that he came to Kansas City in 1884 and was a member of the firm of Cox & Coppinger from 1885 to 1888, as bankers and brokers; they speculated in real estate; in 1888 they organized the State Bank of Kansas City; that he was well acquainted with real estate values in said city and vicinity; that he still owned property in Kansas City and its vicinity; was acquainted with the financial standing of people in that city; it was necessary in the banking business. In addition to this he testified he and Mr. Moore, the other appraiser, personally examined every piece of real estate in Kansas City and vicinity that was inventoried as belonging to the bank.

John A. Moore, the other appraiser, testified he had lived in Kansas City almost all of his life. He was a real estate broker and had been for eight years in that city. Knew the city and vicinity and real estate values. He and Mr. Coppinger devoted forty-three days to an examination of the real estate owned by the

bank and the real estate upon which loans were secured; they made a personal examination into the value of every asset scheduled as belonging to the bank.

Mr. Holden, the assignee, had been engaged in banking in Kansas City and as a broker and investor in real estate for more than twenty years. As assignee he had for a year devoted his time to collecting the assets of the bank and ascertaining their value.

Upon such a showing we think they were competent to express their opinions as to the value of the assets as experts and as witnesses to facts they had ascertained in the discharge of their duties. Their estimate of the real estate under these circumstances was in no sense hearsay.

Equally unfounded is the claim that they were permitted to give their opinion of the value of the property in Alabama, Kansas, and New York, concerning which they knew nothing except from a correspondence with parties in those states. The court rigidly excluded any estimate by these witnesses of this outside property, based upon the correspondence they had in relation to it.

As remarked in the statement accompanying this opinion, the bill of exceptions does not present any copies of the various documents concerning which the witnesses were examined and cross-examined and we have no means of ascertaining whether the objections were well taken or not. It may well be, as contended by counsel for the state, that the notes about which they were questioned would show upon their face, they were past due, and not collectable and had already been charged up to profit and loss. Once for all we will say we can not convict the trial court of error upon any such a showing as is here made upon the admission and rejection of evidence. The burden is upon the appellant to show the error.

It is apparent that many of the answers upon which error is sought to be predicated were called out by defendant's counsel on cross-examination and then asked to be stricken out. We find, also, that evidence complained of was stricken out at the time by the court upon defendant's motion.

Among other things, error is attempted to be based upon a ruling of the court admitting certified copies of the sworn statements made by defendant and the bank officers to the secretary of state, and yet counsel have entirely omitted those statements from this record. If deemed of sufficient importance for an assignment of error it should have been deemed material enough to be incorporated in the record. In its absence we will not attempt to pass upon its admissibility.

When first offered, the court refused to permit counsel to inquire into the value of the stock of the Realty Investment Company, but it afterward allowed the evidence to go in and, indeed, the counsel for the state withdrew all objections to this character of evidence.

Many depositors testified to demanding their money and the failure or refusal of the employees of the bank to pay them. All this evidence was admissible whether defendant personally heard the demands or not. It was evidence of a failure of the bank to meet its obligations in the ordinary and regular course of business.

There was no error in permitting Mr. Moore, the appraiser, to state the value of the American Bank Building stock. He first stated he knew it. What his means of information were was a matter for cross-examination. Nor was there any error in permitting this witness, *in answer to defendant's questions*, to state that as an appraiser he had valued the Denison Land Company's shares at fifty cents on the dollar, and the Denison Land and Improvement Company's at $3 per

share. *No objection was made to it.* Why it should have been italicized in the brief under such circumstances is past our understanding. Without reference or guide we have been compelled to search through this immense record of two thousand pages to find that defendant elicited this evidence himself, and made no objection to it.

There was no error in refusing to let the witness, Root, place a value upon the American Bank Building, based upon his knowledge of its cost. It was not shown that the stock had no marketable value, and if it had been, no effort was made to show the value of the assets of the corporation. Certainly it was not proper to ask the value of the building separate from the ground, or the ground separate from the building. The court did not exclude evidence as to what the real estate as it stood with the building on it was worth as a whole. The witness was nowhere asked what *the market value* of the building was at the time. This evidence is only received to show the value of stock in the absence of better evidence. It had already been shown that the stock itself had a value, and the inquiry, at most, should have been confined to the market value at the date of the assignment or failure. This is the full extent to which *Hewitt v. Steele,* 118 Mo. 463, went. In that case it was shown the corporation had never put its stock on the market, and we permitted proof of the market value of the plant, the only property it had, in order to determine whether the stock had been negligently sacrificed.

Neither was there any error in excluding Mr. Hanna as a witness to the value of the Denison Building and Land Company. He himself testified he sold his stock in the company in 1892 and did not know its value July 10, 1893.

When Albert Marty was on the stand it was sought

by defendant to show the value of the American Bank Building Company's stock by giving the value of the land and building separately.   Whereupon the criminal court ruled "that he may testify to the reasonable market value of this property on July 10, 1893."   This was correct.   Defendant introduced his evidence on this theory, and had the full benefit of it.

The exclusion of the testimony of W. F. Reed to prove what the supreme court of Kansas had decided with reference to the Buchanan law and the effect of tax deeds is not shown to be prejudicial in any way. It would seem that it had, or was supposed to have, some relevancy to a tax deed in evidence, but as neither the tax deed nor the Kansas law has been preserved in the bill, we would not be able to apply the decision of the supreme court of Kansas to the facts, and hence must presume the circuit court correctly excluded it.

We have not overlooked or failed to consider other objections to evidence, but we do not deem it necessary to lengthen this opinion, already too long, by minute reference thereto.   It will suffice to say we find no reversible error either in the admission or rejection of evidence.

III.   The court's instructions are challenged.   Instruction numbered 7 has been approved so often in this state that we must decline to enter upon its defense.   *State v. Carlisle,* 57 Mo. 102; *State v. Brown,* 104 Mo. 365; *State v. Wisdom,* 119 Mo. 539.

The ninth and tenth instructions directed the jury that if Mrs. Vogt, either alone or with some other person, deposited the money for and in behalf of herself and other persons, the owners of said money, then, for the purposes of the trial, they would consider the money was deposited by Mrs. Vogt.   As the evidence disclosed beyond controversy that she was the president and member of a voluntary charitable association

to whom the money belonged, and as such had been intrusted with the money, unquestionably the indictment and instructions properly laid the ownership in her as against all wrongdoers and tort feasors, and there was no variance in the proof.

It is said by defendant that the fourteenth instruction is erroneous in not defining what it meant therein by "assenting to the reception in said bank of a deposit of three hundred dollars of money of the value of thirty dollars or more" after he had knowledge that said bank was in failing circumstances. These words are all plain, simple English words and express very clearly what would constitute a criminal taking or reception of the money. An attempt to simplify would end only in mistifying. This demand for explanation of such common expressions readily understood by all people of ordinary intellect is without reason. It assumes an ignorance on the part of jurors which, if true, would stamp the jury system as a fraud. We have not found the ordinary juror so ignorant, and are unwilling to believe he is incapable of comprehending an instruction so simple as this. Moreover, the fifteenth instruction advised the jury as to the law if an employee under defendant received the deposit.

The defendant argues that to make defendant liable for the reception of the deposit by one of the employees acting under his direction and authority such authority must have been given after he knew the bank was in failing circumstances. This can not be true. The moment he became aware the bank was in failing circumstances the law devolved upon him the duty of revoking the authority of any employee under him and subject to his control to receive any further deposit and his failure to prevent further deposits must be construed as a continuing authority to receive them,

an assenting thereto, because by one word it was in
his power to close the bank, or notify all parties that
no more deposits would be received. This was the
plain measure of his duty as prescribed by the law,
which he was conclusively bound to know.

The seventeenth instruction is in these words:

"The court instructs the jury that the failure of ·
the banking institution in this case is *prima facie* evi-
dence of knowledge on the part of its cashier that the
same was in failing circumstances on July 10, 1893.

"The court instructs the jury that *prima facie* evi-
dence is such that raises such a degree of probability ·
in its favor that it must prevail unless it be rebutted or
the contrary proved."

This instruction is a rescript of the statute and
was expressly approved after an exhaustive examina-
tion and discussion in *State v. Buck*, 120 Mo. 479.
But we are now asked to reconsider that case and say
that this instruction should not be given without the
further modification suggested in these words, "in the
absence of any evidence tending to explain or modify
that presumption." This would be tautological. The
court had already told the jury the presumption
was subject to be rebutted and overturned by the
other evidence. Along with this instruction the court
was careful to instruct the jury they must acquit
unless they found defendant guilty beyond a reason-
able doubt upon the whole evidence.

It is true it has been said that a *prima facie* case is
not sufficient in a criminal prosecution. If it is meant
by these cases, as we think it is, that the state has the
burden throughout a criminal prosecution to show the
guilt of the defendant beyond a reasonable doubt then
we heartily concur in that view, but if on the other
hand it is meant that the presumptions indulged by the
law in civil cases have no effect in a criminal case we

do not agree to it. From time immemorial in the prosecution of prisoners for larceny and burglary the common law courts have uniformly instructed the juries that recent possession of stolen property was *prima facie* evidence that the person in whose possession it is found was the thief, and if he failed to account for his possession of such property in a manner consistent with his innocence this presumption became conclusive against him. In such a case is it not self-evident that the *prima facie* case is sufficient, and conclusive, unless rebutted by the other evidence in the case?

After a most careful and patient review of the effect of presumptions in such cases in *State v. Kelly*, 73 Mo. 608, SHERWOOD, C. J., deduced this result: "In cases of this sort, the state, by reason of the presumption arising from the fact of possession, has adduced *prima facie* evidence of theft; and evidence of this description is said to be such as is sufficient to establish the fact, and if not rebutted, becomes so conclusive as to require a verdict in accordance therewith." Citing *Kelly v. Jackson*, 6 Pet. 622; 1 Greenleaf, Evid., sec. 33, note; *United States v. Wiggins*, 14 Pet. 334; *Com. v. McGorty*, 114 Mass. 299; *State v. Dickson*, 78 Mo. *loc. cit.* 447.

Strong as the presumption of theft from recent possession of stolen property is, it stands upon no surer foundation than the presumption of knowledge which the law presumes the cashier and managing officers had of its failing condition from the failure itself, in the absence of evidence rebutting that knowledge. It is entirely possible that the bank may be ruined by the crime or fraud of subordinate employee, or by a sudden and unexpected panic, and the officers be innocent of all wrong. In this case the deposit was made about 3 o'clock in the afternoon and before 8 o'clock that night the deed of assignment was drawn up and exe-

cuted ready for recording the next morning. As cashier of the bank it was defendant's duty to know the condition of the bank's finances. He knew there was only $11,000 in the vault and that the liabilities amounted in round numbers to $2,000,000. It is utterly contrary to human and business experience that the man most intimately acquainted with the bank's resources could have been ignorant of the impending failure. We think the presumption accords with the common experience of mankind and casts the burden upon the one whose duty it is to account for the moneys confined to his keeping.

We have gone carefully through all the other instructions and are of opinion that the court fully and fairly instructed the jury upon every point and this being true there was no error in refusing instructions prayed for by the parties.

Finally, it is urged that the judgment must be reversed because the jury rendered a general verdict of guilty and did not specify the count. The evidence shows but one transaction, the receipt of the deposit and the issuing of the certificate of deposit. When the several offenses charged in the different counts of an indictment, though distinct in law, spring out of one and the same transaction or are so connected in their facts as to make them parts of one transaction, the defendant can not be prejudiced by the joinder, and the court will not compel an election and will sustain a general verdict. 1 Bishop on Criminal Procedure, sec. 457, note 3, and secs. 458 and 459; *State v. Testerman*, 68 Mo. 408; *State v. Core*, 70 Mo. 491; *State v. Noland*, 111 Mo. 473.

Being unable to sustain any of the errors assigned, the judgment is affirmed. SHERWOOD and BURGESS, J. J., concur.