STATE OF MISSISSIPPI v. EDMUND MITCHELL.

[51 South. 4.]

CRIMINAL LAW AND PROCEDURE. *Receiving deposits in insolvent bank.* Code 1906, § 1169. *Manual reception by defendant unnecessary.*

Under Code 1906, § 1169, making it a crime for an officer or agent of a bank, knowing or having reason to believe it to be insolvent, to receive a deposit without informing the depositor of its condition, it is no defense to a director that he did not manually receive the deposit where, knowing its insolvency, he caused the bank to be kept open for deposits.

FROM the circuit court of Jackson county.

HON. WILLIAM H. HARDY, Judge.

Mitchell, appellee, and others were jointly indicted for knowingly received a deposit in an insolvent bank. A severance being granted, appellee was separately tried, and from a judgment of acquittal, predicated of a peremptory instruction ni his favor, the state appealed to the supreme court.

The facts are stated in the opinion of the court. For a decision in this case on a former appeal, see *State v. Mitchell*, 95 Miss. 130, 48 South. 963.

*B. P. Harrison,* district attorney for appellant.

In construing a statute the usual and proper mode is to ascertain the intention of the legislature from the language used in such statute, connected with the state of the law prior to the enactment of the statute. When the courts know for what particular mischief the legislature intended to provide a remedy, it is their duty to construe the statute so as to most effectually suppress the mischief and advance the remedy. *Coslar v. Lorillard,* 14 Wend. 297. Statutes are not to be construed so strictly as to defeat obvious intentions of the legislature. *United States v. Wiltberger,* 18 U. S., 5 Wheat. 76, 5 L. Ed. 37; *Manitowoc County v. Truman,* 91 Wis. 12; *United States v. Freeman,* 44 U. S., 3 Howard, 564, 11 L. Ed. 737; *United States v. Saunders,* 89 U. S., 22 Wall. 492, 22 L. ed. 736.

In construing Code 1906, § 1169, under the rule above stated and authorities cited, we must look to the intention of the legislature in enacting the above statute. This court in *Hughes v. Lake,* 63 Miss. 557, said: "The object of the statute is to protect the confiding public from the victimization apt to result from depositing in an insolvent establishment, and it seeks to give protection by denouncing its penalty against him who received a deposit, knowing, or having good reason to believe, that the establishment is insolvent."

Again in *State v. Bardwell,* 72 Miss. 538, this court said: "The purpose of the statute is to protect depositors against the

acts of officers and employes of an establishment, first in with-holding, by abstracting, or concealing the assets so that they may not be subjected to the demands of creditors; second, re-ceiving deposits while the establishment is insolvent, and such condition is known to the officer, or such facts are known as to give him good reason to believe the condition of actual insol-vency to exist." See also *Baker v. State,* 54 Wis. 368; *Meadow-croft v. People,* 163 Ill. 56, 35 L. R. A. 176; *Cook v. Hart,* 146 U. S. 183, 36 L. ed. 934; *Re Cook,* 49 Fed. 842.

Therefore, if the object of the statute was to suppress the business of banking by insolvent persons and corporations, and to protect the confiding public from the victimization apt to result from depositing in insolvent establishments, it would be a travesty on justice to hold that all who entered into a con-spiracy were not criminally liable. In other words, the con-tention advanced by learned counsel for the appellee, and sanc-tioned by the court below, is that although a banking institu-tion might be hopelessly insolvent and this fact known by the directors of the bank, and while in this insolvent condition the bank, through the orders and authority of the members of the board of directors, kept and maintained the doors of the bank open, employed persons to be installed in the offices of the bank for the reception of deposits from the confiding public and actually, under these circumstances received deposits in said insolvent bank, the directors are not liable under Code 1906, § 1169; but that the person, servant, or agent who actu-ally received the deposit is alone liable under said section.

Laws are never enacted to excuse the guilty and condemn and punish the innocent. The legislature never intended by enacting said code section to punish the solitary individual, the salaried clerk, whose sole duty might be to stand at the win-dow in the bank and receive deposits, and to excuse the direct-ors through whose instrumentality and authority the bank, while insolvent, and known by them to be insolvent, and yet kept open for the reception of deposits. This court knows that

it is not infrequent that the person who receives the deposit in a bank is not an officer of the bank, and never has an opportunity of examining the loans of the bank, or the condition of the bank as to its solvency or insolvency, and who never attends or is permitted in the conferences of the board of directors; and yet, appellee says that this person, employed by the bank, might be criminally liable under Code 1906, § 1169, and not the members of the board of directors because one actually received the deposit in the insolvent bank and the other did not. The one is a tool who might be liable; and the others, who are the directors and whose duty it was to know the exact condition of the bank, and who knowing these conditions and that it was hopelessly insolvent, or might have good reason to believe that it was insolvent, continued to keep and maintain the doors of the bank open to the public and receive deposits, and directed through the employes who were mere tools in the hands of the directors, could not be liable under the statute.

Black's Law Dictionary gives the following definition of a manager: "A person chosen or appointed to manage, direct, or administer the affairs of another person, or of a corporation or company." The following definition is given of a director: "A person appointed or elected according to law and authorized to manage and direct the affairs of a corporation or company." Webster gives the following definition of a manager: "One who manages; a conductor; or director. Webster also defines a director as being one who, or that which directs; one who regulates, guides, or orders; a manager or superintendent. One of a body of persons appointed to manage the affairs of a company or corporation." Under the foregoing definition of a manager or director, there can be no question but that the word "manager" in the statute is synonymous with the word "director."

The gravaman of the offense here under consideration is the reception of the deposit in an insolvent bank, when appellee knew, or had good reason to know, it to be insolvent.

The record shows that appellee owed individually as an endorser to the Scranton State Bank at the time of the reception of the deposit mentioned in the indictment, an amount over $30,000; that being thus indebted to the aforesaid bank, together with his other obligations, he himself was really insolvent; and that only a small per cent of claims against appellee was collected by the bank.

We submit, therefore, that taking into consideration that this appellee was indebted in a large amount to this bank personally and as endorser; and being interested as shown of record in other concerns that were indebted to this bank for thousands of dollars, it was a question of fact, taking into consideration his constant attendance at the director's meeting; and knowing these large loans made by the bank to concerns that he was interested in, and to himself, and knowing the condition of these institutions that owed the bank, that he was personally interested in, surely it was a question of fact to be submitted to the jury whether or not he knew, or had good reason to believe that the bank was in an insolvent condition.

For additional authorities in support of this brief, see *McClure v. People,* 27 Colo. 358, 61 Pac. 612; *State v. Warner,* 60 Kan. 94; *State v. Shove,* 37 L. R. A. 142; *Baxter v. Coughlin,* 70 Minn. 1; *State v. Yetser,* 97 Iowa, 432; *State v. Bonner,* 103 Iowa, 106; *State v. Buck,* 108 Mo. 622; *State v. Blomer,* 103 Iowa, 113; *Dodge v. Masten,* 5 McCrary, 404; *State v. Carr,* 16 South. 150.

*George Butler,* assistant attorney-general, on the same side.

Even if it be hypothetically conceded that appellee is not within the terms of the statute for the present purpose, he must be held guilty if he had knowledge of the insolvent condition of the bank, and participated in, and connived at, the reception of deposits without the depositors being informed of its insolvent condition. There is a general rule that there are no agencies in crime. What a man does by his agent he does by

himself, and if appellee, as director of the bank, with knowledge of its insolvent condition, held the bank out as a solvent and safe bank, and invited the confidence of the public, and solicited the deposit of funds, and placed a cashier, in charge of the bank with instructions to receive deposits, then he actively participated in, and is a party to the crime. The legal question is not affected by the fact that appellee was not physically present. If half a dozen men agree to take the life of another, and employ and direct a third party to assassinate such other person, they are as guilty of murder as the one who does the actual killing, even though they are not present when the actual killing occurs.

There is no difference in principle between murder and any other crime. The same rule of law applies to all alike.

If half a dozen men should agree to put off on another as true a false, or forged promissory note, and in pursuance of that understanding, should employ a third party to negotiate the note, they would be as guilty as the person who negotiated it, whether they were present at the time of the negotiation or not.

If we apply this principle to the case at bar, why should not a director, who held the bank out as solvent, by his acts and conduct, secured the confidence of the public, solicited deposits of public money, and participated in the fruits of the illegal transaction be held responsible for the criminal act? As suggested by associate counsel in this case, if this rule is not to prevail, then all the board of directors, president, and managing officers in an insolvent bank have to do to escape criminal liability for receiving deposits without informing depositors as to the bank's condition, is to place some one at the window to receive deposits who is thoroughly ignorant of the insolvency of the bank. If he should receive a deposit, when the bank is in such condition, he can truthfully plead ignorance of the insolvency. If on the other hand the president, or the directors are indicted, they in turn can escape by pleading that they did not receive the deposit. Such a rule is not to be tolerated.

*Fitts & Leigh,* for appellee.

Code 1906, § 1169, undertakes to create and punish a stat-utory crime in derogation of the common law, and must be strictly construed. In its essential nature, the crime is an ex-tension of the doctrine of false pretenses. Eliminating, for the sake of discussion, all matters of removing, secreting, and concealing assets, the conduct denounced and punished so far .as receiving deposits is concerned, is the act of that person who receives the deposit, knowing the bank to be insolvent, without notifying the depositor of the condition of the bank. Keeping an insolvent bank open is not the crime; making a deposit in an insolvent bank is not the crime; nor is receiving the deposit a crime, but the person who makes the pretense that the bank is solvent by receiving the deposit, and knowing of that insolvency fails to exculpate himself by notifying the depositor of the fact that the bank is insolvent, is guilty of the crime denounced by the statute.

It accordingly follows that the only person who can be guilty of this crime is the person who, having the guilty knowledge, received the deposit without giving to the depositor notice of the insolvency. If the director, Mitchell, had been at Ocean Springs when Mrs. Aline Phelps proceeded to make her de-posit, and had known of the insolvent condition of the bank, who can say that he would not have notified her of the insolv-ency? It might be, and often is, the earnest desire and delib-erate intention of a depositor, interested in the resuscitation of the failing fortunes of a bank, to make his deposit at the very time when it is most needed. It is no crime for the bank to receive such a deposit, or for the interested depositor to make it. The whole body of the crime consists in the failure to give notice. And it is a necessary corollary to this proposi-tion that no person can be guilty of this crime who has not, and never had the opportunity to do the very thing the statute seeks to encourage and insure.

The undisputed facts place Mitchell at Scranton at the very time that Mrs. Phelps presented herself to the teller of the

branch bank at Ocean Springs; they clothe him in ignorance·
with respect to any intention on her part to make the deposit;.
and they put him in a place, and in any attitude where he not
only did not receive the deposit, but where he absolutely did*
not know that it was going to be made, and where he had no·
opportunity to speak up and say to her that the bank was in-
solvent or in a failing condition, and then allow her to decide·
and determine whether or not she would make the deposit, not-
withstanding his statement as to the condition of the bank.
And *non constat* she might have gone forward and made the de-
posit after he had said the words necessary to excuse him from
all liability under the statute.   Since the dawn of the Christian.
era men are responsible for what they do themselves, and not·
for what others do.   *State v. Warner,* 60 Kan. 99; *Stewart v.
State,* 49 South. 615; *Cunningham v. Norton,* 125 U. S. 77;·
*Gordon v. State,* 23 Am. Rep. 576; *Stern v. State,* 21 Am. Rep.
267; *Corn v. Murphy,* 52 Am. St. Rep. 496; *Corn v. McKie,.*
61 Am. Dec. 411; *Haven v. New Hampshire Asylum,* 38 Am..
Dec. 512; *Terry v. Bank,* 30 Am. St. Rep. 87; *Budd v. Rob-
inson,* 22 Am. St. Rep. 816; *State v. Warner,* 60 Kan. 99;
*State v. Wells,* 134 Mo. 244; *Stadler v. Bank,* 74 Am. St..
Rep. 598.

WHITFIELD, C. J., delivered the opinion of the court.

The appellant, along with certain other directors and manag-
ing officers of the Ocean Springs branch of the Scranton State
Bank, the parent bank being at Scranton, Miss., was indicted
under the last half of section 1169 of the Code of 1906, which
is in the following words:

"1169 (1089). *The Same; Removing, Secreting or Conceal-
ing Assets of Bank, Receiving Deposits When Bank Insolvent,
etc.*—If the president, manager, cashier, teller, assistant, clerk,.
or other employe or agent of any bank or broker's office or es-
tablishment conducting the business of receiving on deposit the
money or other valuable things of such [other] persons, shall re-

move or secrete or conceal the assets or effects of such establishment for the purpose of defrauding any of the creditors of the establishment, or shall receive any deposit knowing, or having good reason to believe, the establishment to be insolvent, without informing the depositor of such condition, on conviction, he shall be imprisoned in the penitentiary not longer than five years."

There were three counts in the indictment. The first count charged that the defendants knew that the said branch bank was insolvent at the time of the reception of the deposit, the second count charged that they had good reason to believe that the branch bank was insolvent, and the third count charged that the defendants had good reason to believe that both the branch bank and the parent bank were insolvent. All three counts charged that the said branch bank was insolvent at the time of the reception of the deposit. We set out below in full the second count of the indictment, that the precise crime charged may be seen:

"And the grand jurors aforesaid, upon their oaths aforesaid, do further present that Louis Lundy, H. S. Rourke, J. W. Stewart, Edmund Mitchell, and O. Randall, on the date aforesaid, in the county aforesaid, being then and there and for a long time prior thereto directors and managers in and for the Ocean Springs branch of the Scranton State Bank, the said O. Randall then and there being the president of the said branch bank, and the said Louis Lundy being then and there cashier of said branch bank, a corporation incorporated under the laws of the state of Mississippi, and domiciled in said county, and engaged in the business of receiving on deposit the money and other valuable things of other persons, and as such directors and managers aforesaid, being then and there conducting the business of receiving on deposit the money and other valuable things of other persons for the said Ocean Springs branch of the said Scranton State Bank, the said branch bank being then and there wholly insolvent, and the said Louis Lundy, H. S. Rourke, J. W. Stewart, Edmund Mitchell, and

O. Randall, directors, managers, and officers aforesaid, then and there having good reason to believe that the said branch bank was insolvent, did then and there unlawfully and feloniously receive a .deposit of money in the sum of ninety-five dollars from one Mrs. Aline Phelps, a depositor, the said money being then and there of the value of ninety-five dollars, in the legal and current money of the United States of America, which sum of money was then and there received for deposit in said branch bank; and the said Louis Lundy, cashier, H. S. Rourke, J. W. Stewart, Edmund Mitchell, and O. Randall, directors, managers, and officers aforesaid, did not then and there, or at any time prior thereto, inform the said Mrs. Aline Phelps, a depositor aforesaid, that the said branch bank was then and there insolvent—against the peace and dignity of the state of Mississippi."

The facts summarized makes this case clear beyond all reasonable doubt: The Scranton State Bank was a banking corporation organized under the laws of the state of Mississippi, with branch banks at Moss Point and Ocean Springs, Jackson county, Miss. All of the books of the bank and all of the loans of the bank were kept and made at the office of the parent bank in Scranton, and the only functions the branch banks performed were to receive and pay out deposits. Edmund Mitchell, appellee, resided and did business in Scranton, and was at the date of the reception of the deposit, and had been for many years prior thereto, one of the directors of the said Scranton State Bank, and as such director was then and there one of the managing officers of the said bank. As such director, and necessarily one of its managing officers, appellee was indicted under section 1169, Code 1906, together with the other directors and officers of said bank, for receiving a deposit of money in the branch bank at Ocean Springs, in said county and state, while said Scranton State Bank was in an insolvent condition, and "when then and there the said appellee knew, or had good reason to believe, that the said Scranton State Bank was insolv-

ent." To this indictment the appellee entered a plea of not. guilty, and on this issue a jury was legally drawn and impaneled to try said cause, and the state then submitted its case, showing the above facts, together with the following facts; that is: That at the time of the reception of the deposit charged in the indictment against appellee the appellee was. not in the branch bank, nor was he in the town of Ocean Springs, but was at said time in Scranton, a place some fourteen miles from the place where said deposit was received, going about his ordinary everyday duties. At the conclusion of the evidence offered for and on behalf of the state, the defendants. announced that they had no evidence to offer, but filed a motion to exclude the evidence offered on the part of the state, and requested the court to instruct the jury to find peremptorily the defendant not guilty of the crime charged.

The state then requested the court to instruct the jury in substance as follows: "That even though the jury might believe that the defendant, the appellee, was not present at the time of the reception of the deposit charged in the indictment, and even though they might believe from the evidence that he did not know of this specific deposit being made in said branch bank, yet if the jury further believed from the evidence beyond a reasonable doubt that the defendant was a director in the Scranton State Bank, and that said branch bank at Ocean Springs on the date laid in the indictment was kept open through the direction of said appellee and the other directors. of the bank for the reception of deposits, and further believed from the evidence beyond a reasonable doubt that the appellee knew, or had good reason to believe, on said date, that the said bank was in an insolvent condition, then you should find the defendant guilty as charged."

The motion to exclude the evidence offered by the state and the peremptory instruction prayed for by the appellee to find the defendant not guilty were granted by the court, and the instruction prayed for by the state was refused, to which ac-

tions of the court the state excepted, and the said cause was by the district attorney, on behalf of the state, appealed to the supreme court of the state of Mississippi to test the questions of law involved. It is shown that the deposit was actually received by Louis Lundy, the cashier of the said branch bank at Ocean Springs; that this defendant at that time was some fourteen miles away, at Scranton, where the parent bank was located. It is perfectly clear from the evidence that the said branch bank was utterly insolvent on the day of the reception of this deposit, and had been for some time prior thereto; that the said branch bank was kept open for the reception of deposits under the authority of the directors and managing officers, and that the managing officers and directors of the said branch bank knew the bank was insolvent, but did not close the doors of the bank when they knew it had become insolvent, and did not give any instructions to cease the reception of deposits, although said insolvency was well known to them.

The main defense pressed by the appellee, this being an appeal by the state to settle the legal question involved in the giving of the peremptory charge for the defendant and the refusal of the charge indicted *supra* for the state, was that, under this statute, no one of the officers or employes of a bank can be convicted unless the particular employe or officer indicted actually manually received the deposit, etc. If this be the true construction of this statute, it might as well be repealed; for it is obvious that, under such construction, about all that the officers of such an insolvent bank need do is to place some one at the window of the insolvent bank to receive deposits who is thoroughly ignorant, and who is kept in ignorance, of the condition of the bank. If such person should receive a deposit, being so ignorant, he can truthfully say he knew nothing of the condition of the bank, and claim an acquittal. If any officer of the bank is indicted, he can escape under such construction by saying that he did not actually receive the deposit. Such a construction is monstrous, in view of the well-known

purpose of the legislature in enacting this statute. This whole-
some statute first appears in our laws in the admirable Code
of 1880, prepared by ex-Chief Justice Campbell. It was ob-
viously intended to prevent the existing evil on the part of in-
solvent banks of perpetrating the gross and outrageous fraud
upon the confiding public of receiving money from depositors
when the bank was insolvent, and known by its officers to be in-
solvent, without warning such depositors by telling them of the
insolvent condition of the bank, which information would, of
course, enable such intending depositors to withhold the de-
posits and thus prevent themselves from being robbed.

The precise point now presented for decision has never been
passed upon by this court up to this time, and the case is,
therefore, one of the greatest importance to the public. Many
such statutes of like character and with the same object in
view, varying somewhat, of course, in their phraseology the
one from the other, have been enacted in many other states of
the Union, and have been construed by the supreme courts of
those states. We will examine now some of those decisions.

In the case of *State v. Henry Eifert,* 102 Iowa, 188, 65 N.
W. 309, 71 N. W. 248, 38 L. R. A. 485, 63 Am. St. Rep. 433,
the court say:

"The eighth paragraph of the court's charge reads: 'In
determining whether the defendant received or accepted the al-
leged deposit of C. H. Mohling, you are instructed that it is not
necessary that the evidence should show, or that you should
find, that the defendant in person received such deposit, nor
that he was personally present when it was received from said
Mohling, if received at all. It is enough if it was received by
the cashier or agent of defendant under his authority. But
you are further instructed that even though the defendant in-
structed Theodore Eifert to close the bank, and refuse to re-
ceive or accept further deposits, and that, after such instruc-
tions to so refuse deposits, the said Theodore Eifert did accept
and receive from said Mohling the deposit in question, if so

you find from the evidence, still, if the defendant, with knowl-
edge thereof, accepted and retained as a deposit the amount so
received from said Mohling by said Theodore Eifert, and
placed among and treated it as a part of the funds or assets of
the bank, having full knowledge from what source and under
what circumstances and by whom it was received, he will be
deemed to have knowingly accepted such sum as a deposit. If,
however, such deposit was so received without his authority,
and was not accepted by him, if at all, with full knowledge of
the manner and circumstances of its being deposited, if at all,
then he will not be deemed to have knowingly received or ac-
cepted such deposit.' Exception is taken to so much of this
instruction as relates to the action of the defendant in know-
ingly accepting and retaining the deposit, after full knowledge
from whom and under what circumstances it had been made.
The argument of defendant is that when the deposit was re-
ceived and accepted by defendant's son, and entered upon the
books of the bank and upon the depositor's book, the whole
transaction was concluded. Now, the facts appear to be that
the son had for a long time been in the bank, assisting his
father; that the father was in the city of Waverly when the
son, who had charge of the bank, received the deposit; that it
was received on the afternoon of August 15, 1893, and several
hours after the son had received a telephone message from his
father to close the bank and to take no more deposits; that the
father returned to Tripoli the same evening, and then learned
that this deposit had been received, contrary to his orders; that
said money was put into the assets of the bank; and that de-
fendant never paid or tendered it back to Mohling.. Now,
when did defendant 'knowingly accept and receive' this money
as charged in the indictment? We think he must be said to
have done so when he returned home and first knew of the fact
of its receipt. If he had given no directions to stop business
and refuse further deposits, then it might be said that he
should be concluded by the transaction when the money was in

fact received by his son, who had authority to act for him. But, having expressly directed the son to cease business and refuse deposits, he had no reason to suspect or believe that his orders would not be obeyed. It cannot, therefore, be said that he knowingly received and accepted the deposit when it was handed to his son, and by him accepted, without the father's knowledge, and against his express directions. When, however, he arrived home that evening, he became acquainted with all the facts. He then knew that the deposit had been accepted by the son after he had directed him to take no more deposits; he knew who made the deposit; he knew he was then insolvent, and that he had been before the son had received the deposit; and, knowing all the facts, he did not repudiate the transaction, but retained and accepted the money, at the same time knowing that his bank would never open again. It seems to us that when defendant, after full knowledge of all the facts, on the evening after his return, failed to repudiate the act of his son, and took no steps looking to a return of the deposit to Mohling, he then knowingly received and accepted the deposit. It must be borne in mind that this is not a civil action for damages for the recovery of the money deposited. It may be that in such a case recovery could be had of the defendant, notwithstanding the deposit was received by his agent contrary to his directions. But the gist of the offense charged in the prosecution is in knowingly receiving and accepting a deposit, knowing that he was then insolvent. Surely one whose agent, without his knowledge or authority, and in disobedience of his express instructions, receives and accepts for his principal money as a deposit, will not by such act be rendered liable criminally for knowingly receiving and accepting the money; but it cannot be doubted that, after coming into possession of all of the facts, the principal may so ratify the act theretofore done as to make it binding upon himself, and the basis of a criminal liability. If the defendant had, on being acquainted with what had been done, promptly disavowed the act of his

son, and returned the deposit to Mohling, he would not have been guilty, as it could not then have been said that he had knowingly received and accepted the deposit."

In the case of *Baker v. State,* 54 Wis., at page 376, 12 N. W., at page 16, the court say:

"The manifest object of the statute in question was to suppress the business of banking or brokerage by any insolvent person, company, or corporation. It therefore, inflicts punishment upon persons so engaged, knowing the fact. A banker is one who traffics in money, receives and remits money, negotiates bills of exchange, receives money in trust, to be drawn again, or its equivalent, as the owner has occasion to use it. Banking is the business or employment of the banker, or the business of the bank. A broker is one who acts as agent, middleman, or negotiator between other persons. See dictionaries. The very nature of the business prevents it from being conducted by a person isolated from all communication with others. The business, therefore, not only affects the banker or broker, but every person who deals with him as such. The business is not confined to the property of the banker or broker, but involves all property passing through his hands or intrusted to his keeping. A bank implies capital, and capital invites confidence. A man holding himself out as a banker or broker thereby gives public proclamation that he has money, and property readily convertible into money, in his possession and subject to his control, and for that reason he may be safely trusted. It requires no argument to show that such assurance is most inviting and influential with the mass of the people, especially with those unacquainted with the history and character of the man. With them the banker or broker is intrusted with money merely because he is a banker or broker, and hence supposed to have surplus capital as a standing guaranty of his agreements and his integrity. For an insolvent banker, company, or corporation to continue the business of banking is to hold out assurances of responsibility and surplus

capital where neither exists. To do so knowingly is to secure the confidence, and hence obtain the money, of the ignorant and unwary by an implied deception. It is the old story of securing the victim by a display of false colors. To suppress this mischief, to save the public from being induced to deposit money with such insolvent by the implied assurance of responsibility and wealth essential to the business, when they do not in fact exist, was the evident purpose of the statute. Wisconsin is not alone in the enactment of such statutes. Similar statutes exist in Illinois, Iowa, Kansas, Louisiana, California, Missouri, South Carolina, and Michigan."

It will be observed that this opinion was delivered by Judge Cassoday, one of the greatest judges of the Union.

In the case of *Carr v. State,* from the supreme court of Alabama, found in 104 Ala. 4, 16 South. 150, that great Judge McClellan said:

"The evidence showed that defendant and his wife, as partners, carried on a banking business in Colbert county, Ala., under the name and style of Tuscumbia Banking Company; that the defendant was the managing and controlling member of said firm; and that one Harrington was the agent of said firm, and acting cashier and bookkeeper thereof, at the time the deposit involved here was made. It was also made to appear that on the day said deposit was made the defendant was away from Tuscumbia, the town where the business was being carried on, and that the deposit was received by said Harrington for the Tuscumbia Banking Company. On these facts it is contended by the defendant, through objections to and motions to exclude testimony and requests for instructions, that he did not receive the deposit alleged in the indictment, and should be acquitted on the uncontroverted evidence; the theory of the defense in this regard being that no other than a direct, personal, manual receipt of deposits can fill the terms of the enactment. There is nothing in this position. The defendant, as a member and manager of the firm called the Tuscumbia Banking Company, carried on the

business of banking at Tuscumbia. He thereby, so long as the bank was kept open, invited the public, and Robert J. Abernathy as one of the public to make deposits with said firm. Whether present or absent personally, he provided means for the acceptance of this invitation by the employment of Harrington to take possession of deposits tendered in consequence of it for him, and the act of Harrington in so doing, is his act, as fully, in every sense, as if he had performed it by his hands; and this wholly regardless of all considerations as to whether Harrington himself might be held in criminal responsibility for his act as agent. The receipt of the deposit was in the usual course of the business, which the defendant carried on and kept open for the very purpose, among others, perhaps, of receiving on deposit the funds of other persons; and, no matter what agencies he employed, he is guilty under the statute if he at the time knew, or had good cause to believe, that the Tuscumbia Banking Company was in a failing or insolvent condition. 1 Morse, Banks, § 178; 1 Whart. Cr. Law, § 247; 2 Whart. Cr. Law, § 1503; *State v. Cadwell,* 79 Iowa, 432, 44 N. W. 700."

In the case of *State v. Cadwell,* 79 Iowa, 432, 44 N. W. 700, the court said:

"At the time the deposit in question was received, one John X. Aleck was cashier of defendant's bank at Logan, and issued the certificate; and at the time neither of the defendants was present. The certificate, against the objection of the defendants, was admitted in evidence, and the ruling is made a ground of complaint here. A specific ground of complaint in argument is that the defendants were indicted for receiving the deposit, and it is not competent to show on trial that the money was received by another than the defendants personally. We think no such rule has ever been held by a court of last resort. On the contrary, a general and well-recognized rule is that, if a person does the act constituting the offense, through

the agency of another, the act is his, and it is unnecessary to aver the agency in the indictment. It may be charged directly as his act, and proof that he did the act through the agency of another will sustain a conviction. Whart. Crim. Ev. (9th ed.) §§ 102, 112; Whart. Crim. Law (9th ed.) § 522; *State v. Neal,* 7 Fost. (N. H.) 131; *Commonwealth v. Nichols,* 10 Metc. [Mass.] 259 [43 Am. Dec. 432]; *Commonwealth v. Bagley,* 7 Pick. [Mass.] 279; *Stoughton v. State,* 2 Ohio St. 562; *Brister v. State,* 26 Ala. 107. It is further said in this connection that the defendants are not charged with permitting or conniving at the receiving of the deposit, but with receiving it themselves, and that, under the averments of the indictment, the proofs as to Aleck's receiving the money are not admissible. The rule above announced is conclusive of this question. The defendants are indicted as a firm of bankers, and as such they are charged with receiving the money; and it is entirely immaterial whether they received it in person, or through their cashier. In law, if they permitted him to do it for them, they did it themselves.

"Our attention is directed to Code, § 4298, to the effect that the indictment must be direct and certain as to the particular circumstances of the offense charged, when necessary to constitute a complete offense. The indictment in this case charges that the defendants, as such bankers, did, at a certain time and place, being then insolvent, receive the deposit in question. That is certainly a statement of the facts constituting the offense, in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended. Such alone is the requirement of the law. Code, § 4296. Under such averments, the state may prove that they receive the deposits through the cashier of their bank.

"Another point urged as against the admission of the certificate of deposit in evidence is that on its face it is evidence of money loaned, instead of a deposit, that the indictment

charges the offense as receiving, and the law only makes it an offense to receive money on deposit.   The certificate is as follows:

" '$110.00.    Cadwell's Bank, Logan, Ia.,

" 'May 17, 1888.

" 'This certifies that Mrs. Mary E. Oliver has deposited in this bank one hundred and ten dollars payable to the order of self, in current funds, on the return of this certificate properly indorsed.    No. 2,142.

" 'John X. Aleck, Cashier.'

"It is true that the transaction is, in a certain sense, a loan of money, but not in a sense to distinguish it from the deposit contemplated in the law.   In banking circles, deposits are often qualified or distinguished as 'time' and 'call' deposits.   The former is for a specified time, and the latter is subject to call at the pleasure of the depositor.   In fixing the character of the transaction, we look to the intent of the act, making the receipt of deposits by an insolvent bank a crime.   In some measure we judge of that intent by looking to the evil to be remedied by it.   It is a matter of common observation that deposits are made, in banks, upon an entirely different reliance as to security than in the investment of money as a 'loan,' as the term is generally understood.   Banks, in receiving deposits, offer no security, nor is security expected.   The money is thus placed in a bank because of a confidence in its solvency and ability to repay, because of the fact that it is a bank; and this confidence continues, even in the face of the fact that it is so often misplaced.   In the case of ordinary loans, the question of the solvency of the borrower and the safety of the investment is made a matter of prior investigation; and in many sections of the country a pledge of property as security is generally required.   In making these deposits with banks without security, people make no distinctions in the character of the deposits; that is, whether they are 'time' or 'call' deposits.   They are made with the same confidence in the solvency of

the bank, and upon like terms as to security. The repeated instances in which this confidence has been betrayed and depositors subjected to loss, led to the legislation referred to. Under the present law, no insolvent bank has the right to receive money on deposit. It is fair to presume that the legislature used the term 'deposit' as it is ordinarily used in banking and commercial circles, and we see no reason for thinking the law designed a protection for the people against loss by one class of deposits, and not the other. The certificate designates the transaction as a 'deposit,' and we think it clearly within the purview of the legislative purpose."

In the case of *State v. Sattley,* 131 Mo. 464, at pages 491, 492, 33 S. W. 41, at page 48, the court said:

"The defendant argues that, to make defendant liable for the reception of the deposit by one of the employes acting under his direction and authority, such authority must have been given after he knew the bank was in failing circumstances. This cannot be true. The moment he became aware the bank was in failing circumstances the law devolved upon him the duty of revoking the authority of any employe under him and subject to his control to receive any further deposit, and his failure to prevent further deposits must be construed as a continuing authority to receive them, an assenting thereto, because by one word it was in his power to close the bank, or notify all parties that no more deposits would be received. This was the plain measure of his duty as prescribed by the law, which he was conclusively bound to know."

In the case of *State v. Yetzer,* 97 Iowa, 423, 66 N. W. 737, the court held "that an officer of an insolvent bank, who knowing of its insolvency, permits or connives at the receiving of deposits, is guilty of the offense described, whether he is a managing party or not;" and the court further held that "it was not necessary, to constitute a violation of such statute by an officer of the bank who does not personally receive the deposit, that the person actually receiving it should know that

the bank was involvent where such officer knew it and allowed such person to receive it for the bank." At page 437 of 97 Iowa, page 741 of 66 N. W. the court added:

"The bank was in the extreme of insolvency. The defendant was its president, and the fact of insolvency was known to him. He knew that the bank was receiving deposits, and of its inability to pay. The evidence to show that he permitted and connived at the receipt of deposits, including that for which he stands indicted, is so strong that no man, unprejudiced, could doubt his guilt. What might have been his individual purposes and motives is another question, and they may be considered in fixing the degree of punishment. But of the fact of his having permitted the receipt of deposits, knowing the bank to be insolvent, there is no doubt, and the verdict has abundant support."

In a very able opinion, indeed, by Campbell, C. J., in the case of *McClure v. People,* from the supreme court of Colorado, 27 Colo. 358, at page 372, 61 Pac. 612, at page 617, citing a large number of authorities, the court said:

"The question then is: May a banker, or an officer of a bank, exempt himself from criminal liability under the statute, by intentionally absenting himself from the bank, and abstaining from participating in its management, and purposely neglecting to avail himself of means of information as to its financial condition, or by showing that, if he had given attention to its business, his lack of fitness and unfamiliarity with banking methods would not enable him to ascertain its true condition? The mere statement of the proposition, it seems to us, is its own refutation. After a careful examination of the entire record, the writer of this opinion is thoroughly convinced that the offer of evidence made by the defendant and refused by the court amounts to nothing more than this: That the defendant was ignorant of the insolvency of the bank because he willfully ('willfully' in the sense of 'intentionally') neglected the means whereby he could or might have ascertained its con-

dition, and paid no attention whatever to its business, though holding himself out as the president of a solvent institution, thereby encouraging persons to deal with it, or his lack of knowledge arose from the fact that his unfamiliarity with business methods was so pronounced that he could not have ascertained its true condition, had he made an examination into its affairs, but would have been obliged to depend (as he did) upon statements of its solvency made to him by those who had active management of its affairs. A person cannot, upon such a pretext, escape the natural and necessary consequences of his own voluntary acts, which, in this case, clearly amount to criminal negligence. In line with the authorities cited in support of this conclusion is *Carr v. State, supra,* which in all essential particulars is on all fours with the case at bar. The opinion contains an excellent statement of the law applicable to this case as to the duty of a bank officer to know its financial condition, and any excerpt would fail to disclose what only a careful reading of the entire opinion reveals. See, also, *State v. Cadwell,* 79 Iowa, 432, 44 N. W. 700; *State v. Yetzer,* 97 Iowa, 423, 66 N. W. 737.

"It may be true that in the management of a bank the power of its president is less than that of the cashier. But we submit that the president cannot shield himself from criminal liability by casting the responsibility of failure and insolvency upon other officers, who were more immediately and directly contributory to it, by a plea of ignorance of the straits into which the institution has fallen, when that ignorance is due entirely to his criminal negligence in failing to acquaint himself with its affairs, or to his inability, natural or otherwise, to acquire knowledge, had he exercised his faculties to that end. The person who took the deposit in question was an employe of the bank, authorized by its officers to receive deposits into the bank in the ordinary course of business. Defendant, as president, either joined in conferring this authority, or, with knowledge of its existence, acquiesced in it. After the bank

was insolvent, and after defendant knew it, or would have known it, had he not kept himself in ignorance of its financial condition by criminal negligence, he neither revoked the authority of the teller, nor did anything to discourage or put a stop to the taking of deposits by closing the doors, or giving notice that deposits would not be received. By such conduct he clearly assented to the reception of deposits. It was not essential to a conviction that he should assent to this particular deposit, or that he should have acquiesced in its reception after he obtained actual knowledge that it had been made. His recognition of the general authority of the teller to receive deposits, without taking any steps to prevent such action, after he knew, or, in law, is charged with knowledge, of insolvency, is an assent to the reception of this deposit by his employe. *State v. Sattley, supra.*"

We think these decisions state the true construction of statutes of this sort and of our statute. Any other construction absolutely abrogates and renders wholly nugatory the great and wise purpose had in view by the legislature.

The district attorney who prosecuted the appeal below has filed a very masterly brief in this case, from which, because of its excellence, we make the following quotation:

"Surely this was not the intention of the legislature, and if this construction is correct, and adhered to by this court, then the statute under discussion is a nullity, and it will almost be impossible to convict any officer or person in an insolvent bank for receiving deposits, etc., under any circumstance. For instance, the persons constituting the board of directors could very easily employ one person in an insolvent bank whose duty it might be to keep books, employ another person to make the loans for the bank under the direction of the board of directors, another receiving deposits, another keeping books of the bank, none of whom were directors in the bank, and during the operation of the bank in this manner its insolvency was only known by the directors of the bank. Under the contention

of counsel for the appellee, the only person who might be liable under section 1169, Code 1906, would be the employe who actually received the deposit in the insolvent bank.   Following this contention to its final analysis, what would be the conclusion?   When the person who kept the books of the insolvent bank was indicted under said section, he could easily interpose the defense that he could not tell, just from looking at the books of the bank, whether or not the bank was insolvent; and if this theory did not prove tenable, then he could rely on the other theory of counsel for the appellee that he did not actually receive the deposit, and consequently he could not be held liable.   If the person who made the loans for the bank under the direction of the board of directors was indicted under said section, he might say that his only duty was to make the loans; that he only made such loans that the directors thought proper and authorized him to make; and that he did not know of the insolvent condition of the bank.   If this theory, or if this position, was not tenable, he could defend under the other theory advanced by counsel for the appellee, that he did not actually receive the deposit in the bank, and consequently he could not be held liable under said section.   If the members of the board of directors were indicted for receiving a deposit in the insolvent bank, as in this case, although proof would unqualifyingly show that the bank was as rotten as it was insolvent, and as insolvent as it was corrupt, and that they well knew all this, yet directed the employes of the bank to continue to receive deposits in said bank, and to keep and maintain the doors and offices of the bank open for the reception of deposits, they, the directors, might then, under the contention of counsel for the appellee and under the ruling of the lower court in this case, defend on the ground that they did not actually receive the deposit, and, therefore, could not be held liable.   When the person who actually received the deposit in the bank was indicted, his sole and only defense could possibly be that he did not know, or have good reason to believe, that the bank was

insolvent when he received the deposit, and that he was authorized to receive same by the board of directors. The consequence would be that the court would be unable to convict any person connected with the insolvent bank, because the only one who actually received the deposit in the bank might say that he did not know of the insolvent condition of the bank, and the officers of the bank who knew of the insolvent condition of the bank, and who authorized the reception of the deposit in the bank, might say that they did not actually receive the deposit. This contention will not hold."

It follows from these views that the action of the court below in giving the peremptory instruction, directing the jury to acquit the defendant, and in refusing the instruction of the state indicated *supra,* was erroneous.