GEORGE H. GUTRU v. STATE OF NEBRASKA.

FILED NOVEMBER 16, 1933. No. 28571.

' *Gaines, McGilton, McLaughlin & Gaines* and *William L. Dowling,* for plaintiff in error.

*Paul F. Good, Attorney General, Carl H. Peterson* and *George I. Craven, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY and PAINE, JJ., and SHEPHERD, District Judge.

GOSS, C. J.

George H. Gutru was the president and active managing officer of the Newman Grove State Bank. It was closed and taken over by the state banking department on July 16, 1929. On December 30, 1931, an information was filed, consisting of nine counts, each charging George H. Gutru with the offense of feloniously receiving and conniving at the receiving of a described deposit when the bank was insolvent and when he knew it was insolvent. Comp. St. 1929, sec. 8-147. The first deposit was charged to have been received on May 25, 1929. The others followed in chronological order, the last being on July 15, 1929. Defendant was found not guilty on the first count and guilty on the other eight counts. Upon each of these counts he was sentenced to be confined in

the penitentiary for a period of five years, but the judgment provided that the sentences should run concurrently, not consecutively. Defendant brought proceedings in error.

The trial lasted two weeks. The record is voluminous. Many errors are assigned. They have been carefully examined. Too lengthy discussion of their details is prohibitive. The chief questions are whether the bank was insolvent, whether defendant knew it was insolvent, and whether the court erroneously instructed the jury on the subject of insolvency.

The instruction defining insolvency follows:

"No. 9. You are instructed that under the laws of this state a bank shall be deemed to be insolvent when the actual cash market value of its assets is insufficient to pay its liabilities to its depositors, or when it is unable to meet the demands of its creditors in the usual and ordinary manner. Testimony has been offered and received in this case bearing upon the question of the actual cash market value of the bank's assets on the various dates set forth in the several counts of the information. This evidence was received and may be considered by you on the question of the solvency of the Newman Grove State Bank on the several dates mentioned in the various counts of the information. With respect to the actual cash market value of the assets, you are instructed that a reasonable time must be allowed to realize thereon in the usual and ordinary course of banking business, and what is a reasonable time in determining the value of the assets is for the jury to determine from all the evidence, facts and circumstances appearing in the evidence in this case. The phrase 'in the usual and ordinary manner' means not by forced and involuntary sale, but rather it means an ability to pay depositors as banks usually do and meet all liabilities as they become due in the ordinary course of business."

As heretofore stated, the last deposit charged in the information was received on July 15, 1929. The legislature of that year had amended the "words and phrases"

section (Comp. St. 1922, sec. 7985), which contained no definition of "insolvency," so as to define that word. The amending act was approved March 26, 1929. It contained no emergency clause. The legislative session adjourned April 24, 1929. So the act did not take effect until three calendar months thereafter (Const. art. III, sec. 27), or on July 25, 1929, which was nine days after the bank was closed. However, we quote the new words of the amendment to show the definition devised by the legislature:

"The terms 'insolvent,' 'insolvency' and 'insolvent bank,' as used in this article and amendments thereto, in reference to banking corporations governed by this article and such amendments, shall, for the purposes of this article, have the following meaning: A banking corporation subject to the provisions of this article shall be deemed to be insolvent when the actual cash market value of its assets is insufficient to pay its liabilities to its depositors, or when it is unable to meet the demands of its creditors in the usual and customary manner, or when it shall fail to make good its reserve as required by law, or when the stockholders, upon notice from the department of trade and commerce or its successor, shall fail to make good an impairment of its capital." Laws 1929, ch. 37, sec. 1; Comp. St. 1929, sec. 8-116.

Generally, "The test of insolvency is the insufficiency of available property to pay debts." *O'Bryan v. State,* 111 Neb. 733. " 'Insolvency,' as that term is ordinarily used, is not the same thing as a mere failure to pay debts, but, as applied to an individual or a corporation, it means an insufficient amount of property to pay debts." *Frank v. Stearns,* 111 Neb. 101, 105.

Probably, when the trial judge phrased the instruction and gave it to the jury on June 17, 1932, he had considered the legislative definition of insolvency in the aforesaid act of March 26, 1929. While it had not been adopted as a statutory definition of insolvency, imperatively applicable to the cause on trial, the court evidently

undertook to apply its thought and content. In so doing it appears that the result ought not to be complained of by defendant. The instruction directed the jury not to appraise the bank assets on any particular deposit date as if there had to be an actual market for cash at that particular moment but that a reasonable time must be considered and allowed by the jury for the bank to realize upon its assets in the usual and ordinary course of the banking business, not by forced and involuntary sales. In taking the evidence on this subject the aim and general purpose of the trial seems to have been to discover evidentially the ultimate cash value of each asset as of the time fixed; this value to be determined, however, by such a market as can be found for such an asset in the ordinary manner of dealing. The instruction complained of contains certain sentences which, separated from the rest, would be subject to the criticism of defendant as imposing an unfair burden upon him and making the business of banking criminally hazardous in times like the present. But when these sentences are modified by other language of the instruction, explaining the meaning of words and phrases theretofore used, we think the points criticized lose their harshness and that the jury were not misled thereby but understood them in the sense derivable from the entire instruction. Considering the whole instruction, we think the court expressed in effect the liberal rule rather than the bankruptcy definition which requires obligations to be paid as they become due in order to avoid insolvency. We do not commend the phrasing of the instruction as a model for future use in like cases but are of the opinion it was not prejudicial to defendant. In a current cause, involving the same charge, we have just held: "An instruction that a bank may be deemed insolvent when it is unable to meet the demands of its creditors in the usual and customary manner and when the cash value of its assets is insufficient to pay its liabilities, allowing a reasonable time to realize on such assets, *held* not prejudicially erroneous in a prosecution

against a banker for receiving deposits knowing the bank to be insolvent." *Flannigan v. State,* p. 519, *post.*

Two assignments relate to the testimony of Harry Henatsch, a state witness who had become assistant to the receiver on August 8, 1929; the evidence shows that he was continuously in charge, for the receiver, of the books, records, notes and collections of the bank; while he had no previous knowledge of this bank or its customers or territory he was a Nebraska banker and receiver with years of experience; he began at once to familiarize himself with the notes and other assets; he had investigated the makers of the notes held by the receiver, knew their holdings and the value thereof, and knew their reputation for solvency or insolvency, as of the date of the deposits; he had continued this knowledge and familiarity from the time the receiver took charge until the trial and he had heard the witnesses testify at the trial respecting many of the items; he was permitted to testify giving the specific facts as to each of many notes held by the receiver, stating the knowledge of the witness in relation to the maker, his holdings and the security supporting each note, and to give the estimate of the value placed upon it by the witness as of the dates of the deposits in the information.

Upon a foundation being laid showing his knowledge of the financial condition of the makers, an assistant receiver in charge of notes held by a bank in receivership is permitted to testify to the value of such notes, in a prosecution of an officer of the bank for receiving deposits when the bank was insolvent. 3 R. C. L. 493, sec. 121; 7 C. J. 584; *State v. Gregory,* 198 Ia. 316; *State v. Easton,* 113 Ia. 516; *State v. Welty,* 65 Wash. 244; *State v. Miller,* 131 Kan. 36.

Complaint is made that Reuben A. Johnson, an attorney at law, was permitted, over an objection as to incompetency, to express an opinion as to the value of the bank building and fixtures. We have read his examination and cross-examination and conclude that a sufficient

foundation was laid to permit his testimony to go to the jury for what it was worth.

Error is assigned because the court did not submit "the proposed sale of the bank to Mr. Currie as a strong circumstance tending to prove the solvency of the bank and belief of defendant in its solvency." Mr. Gutru was put in touch with M. E. Currie, cashier of a bank in Schaller, Iowa. The first communication in person between them was a letter from Currie to Gutru, dated June 20, 1929, stating he had been advised that Gutru had "a proposition to offer a qualified banker" and that he was taking the liberty to go to Newman Grove the following Sunday. He made the trip and conferred with Gutru and they had a conference also with the president of another local bank concerning a consolidation. There was evidence that the banking department approved the policy of consolidation where communities were oversupplied with banks and would look with favor upon a consolidation here. A few days later Currie came again and the matter was gone over more in detail. Gutru testified that "the stockholders of each bank were to take out of that bank such objectionable paper as would equal their capital and surplus;" and that Currie requested that a new examination be made by the banking department to guide him in selecting the notes to be taken out in an amount equal to the capital and surplus. Gutru caused the new examination to begin and on July 16, 1929, the banks were closed. Currie appeared a day or two later but nothing was done by him to take over or reorganize the banks. The defendant did not request the trial court to give such an instruction as it now assigns as error on the part of the court to fail to submit to the jury. We know of no statute or positive rule of law requiring such an instruction. "Before error can be predicated upon the failure to charge the jury upon a given point, there must have been a request therefor, unless it is upon a question where a statute or positive rule of law requires the giving of such instruction." *Georgis v. State,* 110 Neb. 352, and cases cited, p. 355; *Welter v. State,* 112 Neb. 22.

Much was said in argument about the failure of the banking department to await the bank consolidation under the auspices of Mr. Currie. The arrangement with him was purely tentative. Even as tentatively comprehended it meant at least a restoration of the $40,000 capital and surplus. Defendant and his counsel had interviewed him in Iowa in May, 1932, to discover whether his testimony would be of value. The trial began June 6, 1932. On June 4, 1932, Mr. Currie mailed from Schaller, Iowa, to Mr. Gutru a letter containing the following:

"I think I told you when you were here a month or so ago on Sunday that we were planning a trip to Texas some time this summer. Our bookkeeper gets through making his canvass for county auditor today and we have suddenly decided to start on our trip tomorrow instead of in July.

"Now I am wondering whether this will make any difference concerning your trial. You mentioned that it came up for trial June 6th but would not be tried until later. If you decided after talking with your Omaha attorney that my evidence would be valuable perhaps the case could be continued until July or if you go ahead in June and a deposition from me would do any good you could make it out and send it here to the bank and they would forward it on to me for signature."

Near the close of all testimony the defendant introduced it in evidence without objection as a part of his defense. Though it would ordinarily be received on June 5th or 6th, no application was made for a continuance.

Error is assigned as to instruction No. 10, wherein the court told the jury the effect of the law requiring such a state bank to maintain a cash reserve in available funds of at least fifteen per cent. of deposits. The court carefully defined the forms other than actual cash in which such reserve may be held and instructed the jury that failure to maintain such reserve is not, of itself, proof of insolvency but is a circumstance to be considered by the jury along with other evidence. This was favorable to defendant.

The only other specific instruction, not already considered, upon which defendant assigns error, is No. 14, wherein defendant argues the court told the jury that the "defendant would be guilty although he had no personal knowledge that deposits had been received." We do not understand the instruction to be so limited. The latter half of the instruction said:

"And where the managing officer of a bank, with knowledge that it is insolvent, permits the bank to continue to receive deposits by its officers and employees, and permits the bank to remain open for the conduct of banking business in the usual and ordinary course, such managing officer would be guilty of permitting, conniving at and being accessory to the accepting and receiving of such deposits so received, within the meaning of the criminal statute, although such managing officer did not personally receive or accept the deposit in question, and even though he may not have known of the receiving of such deposit by other officers."

Under section 8-147, Comp. St. 1929, a managing officer of a bank, knowing it to be insolvent, who authorizes and permits the bank to remain open for business in the usual and ordinary course and to continue to receive deposits through its officers and employees, is guilty of permitting, conniving at, and being accessory to, the receiving of deposits, even though he may not have had actual knowledge of the receiving of such deposits. 3 R. C. L. 497, sec. 124, citing *State v. Mitchell,* 96 Miss. 259; *Appelget v. State,* 33 Okla. Cr. Rep. 125; *Commonwealth v. Croft,* 208 Ky. 220.

Complaint is made of the admission of evidence showing that on June 3, 1929, various deposits were paid to members of the Gutru family and to relatives of other officers of the bank. Gutru himself drew out two deposits of substantial amounts. His father-in-law was paid a $1,500 certificate of deposit not due. It was not paid in cash but was paid by exchanging for it good notes owned by the bank. Gutru's boys and relatives of other

officers likewise cashed certificates of deposit not yet due and withdrew deposits. These incidents, proved in detail, occurred on June 3, 1929. This evidence as to payment of these depositors was competent to go to the jury and to be considered in connection with other facts and circumstances bearing on defendant's knowledge of the insolvency of the bank.

Defendant challenges generally the question of the insolvency of the bank. Its paid-up capital was $30,000 and its surplus was $10,000. On the dates of the deposits its total deposits were around $280,000 varying less than $10,000 in the whole period. Its relative cash reserve on hand available to pay deposits was less than 10 per cent. of the deposits. The main controversy as to insolvency centered around 58 notes which were selected from the assets by the prosecution, concerning the values of a considerable number of which there was much testimony. We have held that the evidence was competent. These notes had a face value of about $140,000 and there was evidence on behalf of the prosecution from which the jury might infer that their real value was less than $20,000, when the deposits charged in the information were received. If this evidence as to values was correct, then the bank was insolvent. It was a question for the jury.

We have considered and discussed the assignments of error that we think merit it. There are others relating to the admission of testimony, to allowing the special prosecutor to participate in the trial, and to misconduct of the special prosecutor. We have considered them and find that the rulings of the court were not prejudicial to the legal rights of defendant.

The judgment of the district court is

AFFIRMED.

EBERLY, J., dissents.