THE STATE v. ARTHUR O. MEININGER, Appellant.

Division Two, January 11, 1926.

1. **CONSTITUTIONAL STATUTE:** Prescribing Offense: Insolvent Bank: Receiving Deposits. Section 3365, Revised Statutes 1919, making it a felony for the officer of an insolvent bank, known to him to be insolvent, to receive money in excess of thirty dollars on deposit, is a valid statute. It sufficiently prescribes an offense, and is not unconstitutional on the theory that Section 27 of Article 12 of the Constitution is not self-executing and that said statute merely reiterates the words of the Constitution and does not prescribe the nature of the offense.

2. **INSOLVENT BANK:** Debt: Relation: Depositor and Depositary. Proof that a certain person on a named date made a deposit of a certain amount of money in the insolvent bank in the usual and ordinary manner of making deposits in a banking institution is sufficient to establish the relation of depositor and depositary. The bank, upon accepting the deposit, became indebted to the depositing owner, and thereby the relation of debtor and creditor sprang up between them, but that did not affect their relation as depositor and depositary.

3. ———: Cashier: Receiving Deposit Through Teller. The cashier of a bank who is its active manager, and personally employs tellers to receive deposits and supervises and directs their work and its affairs, is responsible for the act of the teller who actually receives money on deposit, and is guilty under the statute which makes it a felony for an officer of a bank, known to him to be insolvent, to receive on deposit in the bank money in excess of thirty dollars. In such case the cashier is under the statute (Sec. 3687, R. S. 1919) a principal in the second degree, and may be charged, tried, convicted and punished in the same manner as the principal in the first degree.

4. ———: Fictitious Deposits: Cash-Items Slips. Under the direction of the defendant cashier, the bank teller would make out a deposit slip showing that a named person had deposited a certain amount of money, when in fact he had made no deposit, and would then make out a charge slip against such person and hold it as cash and give said person credit for the amount, without taking a note or obligation of any kind from him. The result was that when such cash-items slips were made, the cash on hand was correspondingly withdrawn from the bank, but the daily statements of assets were made to include these cash items, and the daily statements of assets and liabilities were by them made to balance. *Held*, that, these cash-items slips were in effect fictitious deposits, and as the amount of them far exceeded the bank's capital and surplus on the day a deposit of $300 in money was received on deposit, the jury rightly found that the assets were not worth what the statements stated them to be, and that the bank was insolvent and known to defendant to be insolvent.

5. ———: ———: ———: Fictitious Charge to Another Bank. Under the direction of defendant cashier, the bank teller would credit the deposit accounts with named amounts; the teller would then make out a deposit slip showing that the person named by the cashier had deposited a named amount, when in fact he had made no deposit; the teller would then make out a charge slip against such person and hold it as cash, and give such person credit for the amount, without taking his note or other obligation; and these slips were known and carried as cash items. An examination of the bank by the State impending, the bookkeeper, under the direction of the cashier, charged the cash items, then amounting to more than $200,000, into the individual accounts of depositors, and thereby the cash items were wiped out, and the assets and liabilities made to balance. A year later when another examination was approaching the bookkeeper, under the cashier's directions, charged, on the statement book, the cash items to a trust company, and by that process of switching and juggling the cash-items accounts were wiped out and the bank was given an apparent credit with the trust company of $672,000, when its actual deposits with it were $104,000, and this fictitious deposit with the trust company made the bank's books balance. *Held*, that these facts show that the cashier had embezzled over a half million dollars of the bank's assets, and that the items in the statement book were not worth what they purported to be, and establish beyond question that the cashier knew that the bank was insolvent when a deposit of three hundred dollars was made by a customer a few days after the cash items were charged to the trust company.

State v. Meininger.

6. ———: Fictitious Credit to Another Bank: Unexplained Flight. Where the cashier of a bank, on trial for receiving money on deposit when he knew the bank was insolvent, after falsifying its books so as to show a large fictitious credit with a trust company—falsified a few days before receiving the deposit of three hundred dollars from the customer—went into hiding, when he knew an examination by the State was impending, and did not face the examiners, who closed the bank two days later, and was not seen again for a month or two after an indictment against him was returned a month later, his unexplained flight was a circumstance which the jury might consider, in connection with the other circumstances of the case, as a confession of guilt.

7. ———: Market Value of Assets. Where the State accepts the valuation placed upon the bank's assets by the defendant cashier, there is no need to show their market value.

8. ———: Instruction: Intent to Steal. The court should refuse an instruction telling the jury that, unless at the time the deposit in the bank was received the defendant had the felonious intent to steal the money, and did steal it, they should acquit him. A charge that the officer of a bank received money on deposit, known to him at the time to be insolvent, is not a charge of common-law larceny, but the offense is statutory, for which the officer may be punished to the extent provided by law for stealing the same amount of money.

9. ———: ———: Insolvency: Fictitious Assets. If it be conceded that a bank was solvent if its assets were sufficient to meet its liabilities, it was nevertheless insolvent if its own books show that its purely fictitious assets exceeded its capital and surplus many fold.

10. ———: Failure: Evidence of Knowledge: Instruction for Defendant. An instruction given at the request of defendant cashier stating that "while the court has instructed the jury that the failure of the bank constituted prima-facie evidence of knowledge on the part of defendant that said bank was insolvent," etc., is not error, where the instructions given for the State contained no such statement.

Banks and Banking, 7 C. J., Section 204, p. 580, n. 27, 28; Section 208, p. 584, n. 72, 74; Section 210, p. 585, n. 84. Criminal Law, 16 C. J., Section 14, p. 61, n. 12; Section 1063, p. 551, n. 9, 10; Section 2506, p. 1063, n. 85.

Appeal from Franklin Circuit Court.—*Hon. Ransom A. Breuer,* Judge.

AFFIRMED.

*James Booth, Cole & Jenny, Harvey & Baer* and *Anderson, Gilbert & Wolfort* for appellant.

(1) Section 27, Article XII, Constitution of Missouri, is not self-executing as to the criminal provisions. Fusz v. Spaunhorst, 67 Mo. 256; Cummins v. Wian, 89 Mo. 56. Section 3365, Revised Statutes 1919, does not execute this provision of the Constitution. It merely reiterates the words of the Constitution; it does not "prescribe the nature of the offense" as required. As the Legislature has failed to prescribe the nature of the offense, the courts cannot supply the omission. State ex rel. v. Taylor, 220 Mo. 638; Bondy v. Sims, 263 S. W. 412; State v. Excelsior Springs Co., 212 Mo. 101. Insolvency has various natures and until the Legislature determines what the nature of the insolvency as to banks shall be the courts have no right to usurp this function specifically conferred upon the Legislature. The legislative definition of insolvency in the Bankrupt Act is Subdivision 15, Sec. 1, Bankruptcy Act 1898. Section 22, Article II, of the Constitution, gives the defendant the right to demand the nature and cause of the accusation. The Constitution makers recognized that Section 27, Article XII, did not do this and required the Legislature to prescribe the nature of the crime. There are two different natures of insolvency. Toof v. Martin, 13 Wall. 47; Ring v. Glass Co., 44 Mo. App. 115. Insolvency has been given different meanings by the courts. French v. Andrews, 30 N. Y. Supp. 796; Williamson v. Hatch, 55 Minn. 344; Darrah case, 152 Mo. 528. By Section 27, Article XII, the power to prescribe the nature of insolvency has been specifically committed to the Legislature. Definiteness to apprise the defendant of the facts he has to meet is essential in criminal law. Ex parte Taft, 225 S. W. 457, 461. Section 22 of Article II of Missouri's Constitution and the due process of law clauses of both the Federal (XIV Amendment) and State Constitutions are violated, because Section 3365 and this indictment are so vague

and indefinite that defendant is not informed of the nature and cause of the accusation. Ex parte Taft, 225 S. W. 457; Wabash v. O'Bryan, 285 Fed. 583; State ex inf. v. Ry. Co., 146 Mo. 155; State ex rel. v. Gideon, 273 Mo. 79; United States v. Traction Co., 34 App. D. C. 592. The matters here raised have never been decided. Only one conviction has ever been upheld. State v. Sattley, 131 Mo. 464. In that case GANTT, J., held that naming the of-fense larceny prescribed the nature of the offense. But he later concurred in a contrary view in State v. Hart-ley, 185 Mo. 669. (2) Even if the statute prescribed any offense, the court erred in not sustaining demurrers to evidence, because: Proof is that debt was created, not re-lation of depositor and depositary. Indictment charges deposit. The statute recites deposit or creation of indeb-tedness. The language on the slip is, "Deposit to the credit of." The ordinary credit of money is of the nature of a relation of contract—a debt—and not one of trust, which is that of depositor and depositary. Briggs v. Spaulding, 141 U. S. 132; Bank v. Hill, 148 Mo. 396. The Legislature has not prescribed that the relation between debtor and creditor and between depositor and deposi-tary, are synonymous. On the contrary, the statute main-tains the distinction between the two relationships, so that an allegation of one relationship cannot be sustained by proof that the other relationship existed. State v. Murphy, 141 Mo. 267; State v. Schneider, 259 Mo. 329; State v. Williams, 253 Mo. 312; State v. Castleton, 255 Mo. 210.

*Robert W. Otto,* Attorney-General, and *W. F. Frank,* Assistant Attorney-General, for respondent.

(1) Sec. 3365, R. S. 1919, on which the indictment is based, in obedience to Section 27 of Article 12 of the Constitution, prescribes the nature of the crime and the punishment therefor. State v. Sattley, 131 Mo. 482. (2) This section does not conflict with either the Federal or State Constitution. State v. Sattley, supra; State v. Dar-rah, 152 Mo. 522; State v. Buck, 120 Mo. 479; Dreyer v.

312 Mo. Sup.—34.

Pease, 88 Fed. 978; Meadowcroft v. People, 163 Ill. 56. (3) The evidence shows that defendant was cashier and director of the bank and accepted a deposit in said bank after he knew that the bank was insolvent. The instructions properly declare the law and are sustained by the following authorities: State v. Burlingame, 146 Mo. 214; State v. Darrah, 152 Mo. 526; State v. Salmon, 216 Mo. 466.

HIGBEE, C.—On February 3, 1922, appellant was charged by indictment returned in the Circuit Court of the City of St. Louis, with assenting to the reception of deposits in the Night & Day Bank of the City of St. Louis, after he had knowledge that said bank was insolvent. The venue was changed to the Circuit Court of Franklin County, where he was tried, found guilty and his punishment assessed at three years' imprisonment in the penitentiary. Judgment and sentence were rendered accordingly. After unsuccessful motions for new trial and in arrest of judgment, appeal was granted to this court.

The record shows that the Night & Day Bank was a banking corporation engaged in the general banking business in the city of St. Louis, Missouri, with a capital stock of $75,000, surplus $15,000, and undivided profits ten cents. Appellant was its cashier, director and managing officer and directed the employees of said bank in the discharge of their duties. On December 27, 1921, Irene Michel deposited $385 in this bank, $300 of which was in cash. A teller in the bank accepted this deposit and gave her a deposit slip showing the amount and date of such deposit.

Appellant would direct the head teller to credit the deposits of certain persons with certain sums. The teller would then make out a deposit slip showing that the person named by appellant had deposited a certain sum of money, when in fact he had made no deposit. The teller would then make out a charge slip against such person and hold it as cash, give the party named by appellant credit for the amount without taking note or obligation of any kind from him.

For example, on August 29, 1921, appellant directed the teller to make out a deposit slip to the credit of Meyer Katz for $17,500, and carry the amount on a charge slip as cash. The teller gave Katz credit for $17,500 without receiving any cash or taking any written obligation of any kind from him. In this manner Katz, between June, 1921, and January 1, 1922, was given credit for more than $100,000 on the books of the bank.

L. D. Thompson, then State Treasurer, deposited a part of the state money with this bank. There was no record of this account on the books of the bank. This account was charged to the cash-items account. Three checks, totaling $100,000, drawn on this bank by L. D. Thompson, State Treasurer, and two checks totaling $75,-000, drawn by appellant payable to State Treasurer L. D. Thompson, were all paid out of some fund in the bank, but the books of the bank show no record of these transactions. The two checks totaling $75,000 drawn by appellant were held by the teller as cash. The bank had no assets of any kind representing the $100,000 paid to Katz, or the $175,000 it paid out of its own funds on the checks of appellant and the State Treasurer. These items total $275,000, which is more than three times the capital stock and surplus of the bank. On December 17, 1921, after appellant had received notice from the banking department that the bank would soon be examined, he directed the bookkeeper to charge off cash items totaling $568,656.66, and charge that amount on the statement book as cash in the American Trust Company, thereby showing a credit of $672,000 actual cash in said trust company to the credit of the Night & Day Bank, when in fact it had only $54,435.24 in cash in said trust company on said date. The inventory filed by the Commissioner of Finance on January 6, 1922, shows cash $85,-856.77, and cash items $783,535.91. The dates of the unpaid cash items shown in evidence range from May to December, 1921. On December 27, 1921, the day the deposit in question was made, appellant signed his name to a $50,000 note to the American Trust Company, and on

December 30th he signed a similar note for $100,000 and placed the $150,000 to the credit of the Night & Day Bank.

During the time in question, appellant attended the meetings of the board of directors of the bank and at said meetings represented to the board that the bank had on hand approximately $800,000 in cash. The board of directors did not know that the bank was carrying these cash items and did not know that appellant had borrowed $150,000 and placed it to the credit of the bank in the latter part of December, 1921. The cash items and these notes were never seen or examined by the board of directors.

State's Exhibits 4 and 5, being the cash book, State's Exhibit 3, being the book showing the daily statements of the bank, and Exhibit 6, being the general ledger of the bank, were all introduced in evidence, but are not preserved in the record. These exhibits show the transactions of the bank on each day for several months immediately prior to the closing of the bank. The daily statements of the bank for each day covering a period of several months prior to December 27, 1921, were contained in Exhibit 3, none of which are preserved in the bill of exceptions, except the statement of December 27, 1921, which was supplied by appellant after submission of the case in this court. This bank was closed by order of the Finance Commissioner on January 5, 1922, and has never reopened, and is being liquidated by the Commissioner of Finance, and creditors are filing claims against it.

The foregoing statement, prepared on behalf of the State, fairly outlines the salient facts in the case. The first count of the indictment charges, in substance, that Henry H. Hohenschild and Arthur O. Meininger were, on December 27, 1921, officers and directors of the Night & Day Bank of St. Louis, Missouri, a corporation, etc., duly organized and doing business in the city of St. Louis, Missouri; that said bank was insolvent on said day, as said Hohenschild and Meininger, officers and directors as aforesaid, then and there well knew; that well knowing said bank to be insolvent they unlawfully, knowingly,

designedly and feloniously did on said day assent to the reception of a deposit and did then and there, etc., receive for, on and as a deposit in the said bank, a deposit of $300 lawful money of the United States of the value of $300, the money and personal property of Irene Michel; and so the said Henry H. Hohenschild and Arthur O. Meininger the said money and personal property of the said Irene Michel on the day and in the manner and form aforesaid, unlawfully and feloniously did steal, take and carry away, etc.

The indictment is based on Section 3364, Revised Statutes 1919. As the State elected to stand on the first count of the indictment it is unnecessary to refer to the second count. The defendant was granted a severance, tried, found guilty and sentenced as aforesaid. He was cashier of the bank from its organization in October, 1910, and the active manager thereof continuously until it was closed by the Commissioner of Finance on January 5, 1922.

Frank J. Schneider testified: I was employed by Meininger in the Night & Day Bank, July 6, 1916. I had been employed with the Union Biscuit Company, trucking boxes and filling orders; I had no experience in bookkeeping or banking. Meininger practically learned me everything. I checked for a few months in the savings account. From there I went to the clearing house and then savings teller and when the war came on I got practically into everything; became general bookkeeper in 1918. I was directed by Meininger from one department to the other. I had a slight knowledge about bookkeeping then. As general bookkeeper I kept the cash book, the general ledger and daily statement. Meininger gave me my orders. The bank started with a capital stock of $75,000 and surplus of $15,000. I posted the entries in the daily statement, the cash book and ledger. The daily statement, under date of August 27, 1920, shows cash and cash items $431,482.35; the cash book shows cash $228,910.69; cash items $202,571.66. I had a conversation with Meininger about those cash items in September, 1920. The examiners came in and examined the books and Mein-

inger told me to charge those cash items into the individual accounts; that reduced the cash items and reduced the liability to the depositors. That was done as of August 27th and September 10th and it wiped out the cash items that totaled $200,000. The daily statement on September 10, 1920, shows cash and cash items $309,233.95; the cash book shows cash $231,933.98, but no cash items. The daily statement shows cash on September 20, 1920, $256,496.02; the cash book shows the same amount of cash, but no cash items. The daily statement on December 17, 1920, shows cash and cash items $328,736.43; the cash book shows all this as cash, but no cash items on that day.

I was at the bank all the time. Mr. Wall, one of the state bank examiners, came in about September 20th, but couldn't examine the bank; he came back about December 17th. I knew the State Treasurer had an account in the bank; I had nothing to do with it; it was kept in the individual books. About February 28th, the State Treasurer was given checks or drafts for $75,000; these entries, the $75,000, were made in Meininger's handwriting and he explained to me it was carried as an item. On that day the daily statement shows cash and cash items $408,195.-46; the cash book shows cash $333,195.45, and items $75,-000. On March 4, 1921, the daily statement shows cash and cash items $509,112.35, while the cash book shows cash $384,112.35 and cash items $125,000. On April 1, 1921, the daily statement shows cash and cash items of $466,456.03; the cash book shows cash $181,005.39, cash items $285,450.64. The witness read the cash and cash items from these books at various dates showing that the cash items steadily increased and that on December 17, 1921, the date of the deposit by Mrs. Michel, the cash on hand was $281,779.04 and the cash items were $568.656.-66; on December 19, the cash was $127,485.36 and the cash items $743,333.78. The witness continued: On December 10, the State Banking Department notified the bank for a stockholders' examination. On the 17th, this book was back for a few days. Meininger said to me, "Frank, take

these items totaling $568,656.66, and charge them to the American Trust Company on the statement book.'' That is a diversion of figures from the cash and cash item account to the account of the American Trust Company on the statement book and showing that we had a balance over there of $672,000. The Night & Day Bank had on deposit with the American Trust Company on that day, December 17, $104,325.03. By charging these cash items to that deposit account increased it to $672,981.69. The daily statement on December 22, 1921, shows cash and cash items $101,725.20; the cash book on the same day shows cash $101,725, items $754,961.48. The daily statement on December 24, 1921, shows cash and cash items $865,058.43, while the same entry on the day before shows cash and cash items, $157,535.26. The daily statement on December 24th shows American Trust Company, $137,-148.01; on December 23, 1921, American Trust Company, $614,993.80. I made those entries.

''Q. Why did you do that? A. They had that meeting on January 5th. Mr. Ross, at that time the examiner, instructed me to get these books up. I diverted that entry back, took it out of the American Trust Company and charged it into the cash items; that was done on January 5th.''

Here, on objection, the court said: ''I excluded that; that was done under the direction of Mr. Ross, but otherwise it may stand.''

Witness continuing: I brought the books up to the time the bank was closed on the afternoon of January 5th, or the night. Meininger was not at the bank on the morning of January 4th. He and I left the bank the night before about midnight. I did not see him after that till some time in March or April, after the bank was in the hands of the examiner. (Here witness details his unavailing efforts to find Meininger). On December 27th, Meininger gave me a note for $50,000, signed by himself, and told me to take it to the American Trust Company and get that amount credited to the Night & Day Bank; the daily statement showed we had $54,873.91 deposited there.

On December 30th, Meininger again sent me to the American Trust Company with a note for $100,000. We borrowed in all, $150,000, from the American Trust Company. "Q. Then what you were carrying at that time when you made those two loans on that heading of cash and cash items was how much; that is, the total amount? A. On the 27th it was $855,455.41."

Cross-examination: Hohenschild was president of the bank and continued to be until it closed. After that I continued to work for the Commissioner of Finance. I left there in October, 1922. Mr. Ross came in as Deputy Finance Commissioner with the examiners and took full charge of the bank and took over the cash items, checks and everything else that was there; all the assets were turned over to him. The charge from the cash items to the American Trust Company was just a diversion of figures on the statement book; there was no entry made in the cash book or ledger. The figures made about December 23rd, or 27th, were switched back in the cash items from the American Trust Company on the statement book. Meininger left the bank on January 3rd, about midnight; we were getting up the work on the books; we sometimes worked all night. When a ticket was made and moneys were handed to the teller, the teller made an entry in the pass book and handed it back to the customer, and that ticket was passed along to the bookkeeper and the amount was credited to the customer on the books of the bank, and as checks came in they were charged against the account.

Redirect: "Q. Is that the way the State Treasurer's account was kept? A. The State Treasurer's account was charged to the cash items account." (Here the two notes for $50,000 and $100,000 to the American Trust Company were handed to the witness). These are the notes on which the loans were made about which I testified. They are signed by Meininger. I know his signature; he was cashier and director in the bank.

Wilmar Kingston testified: I was head teller in the Night & Day Bank; I was employed by Meininger and

Hohenschild in November, 1918.  I had no experience in banking before; had worked as stenographer at the bank before; was made head teller in about a year.  At different times I would speak to Mininger about cash items that came into the bank and he would O. K. them.  I talked to him about some cash items of Meyer Katz; about $50,000 at that time; he told me there was some insurance policies there; some boats had been sunk and they were secured by these insurance policies; they were in the bank.  On several different occasions he had me charge off the cash items to the cash item account.  I would make an entry in my blotter charging the cash items off.  Each day I listed the different cash items I was carrying in my cage, and on several occasions when Mr. Meininger would go over the cash items he would lay aside certain bunches of cash items and tell me to charge them to cash items, and I would make an entry on my blotter showing a charge to cash items of that amount.  The last entry I remember was in December, 1921, $174,677.12.  Meininger laid out a bunch totaling that amount and told me to charge them to general items; that showed I had that much less cash; that reduced the cash and added to the cash-items account.  A cash item would be a check that was OK'd by one of the officers of the bank; it could be a credit to different individual accounts and a slip placed to represent that much cash.  There was no cash in the bank to back up those cash items.  I carried them as cash.  (Here numerous exhibits were handed to the witness).  I have handled them.  Exhibit 10 reads:  "Night & Day Bank, charge Meyer Katz.  Credit act. $1,000.  Approved.  See A. O. M., cashier.  St. Louis, 12/3/21."  Meininger instructed me to make a deposit of $1000 to the credit of Meyer Katz and I ran a deposit slip through in the regular way and held the slip in my cage as cash.

Witness went over the exhibits from 10 to 79, showing large credits given to Meyer Katz for which no cash was received.  These slips were carried as cash items.  It

is unnecessary further to set out the evidence as the facts are sufficiently summarized in the respondent's statement.

The court gave the following instructions for the State:

"1. The court instructs the jury that if you shall believe and find from the evidence beyond a reasonable doubt that the defendant, Arthur O. Meininger, at the city of St. Louis and State of Missouri, on the 27th day of December, 1921, or at any time within three years next before the finding of the indictment herein, was a director and the cashier of the Night & Day Bank of St. Louis, Missouri, and that the same was a corporation doing business as a banking institution in said city and state, and that the defendant did then and there unlawfully and feloniously assent to the taking and receiving on deposit in said banking institution the money of Irene Michel to the amount of thirty dollars or more, to-wit, the sum of three hundred dollars, and that said banking institution was then and there insolvent and that the defendant was then and there a director and the cashier of said banking institution doing business as such, and that the defendant had knowledge at the time when such deposit was received that said banking institution was insolvent, you will find the defendant guilty and assess the punishment by imprisonment in the penitentiary for any time not less than two years and not more than five years.

" 'Feloniously,' as used in these instructions, means wickedly and against the admonitions of the law.

"2. If the jury believe and find from the evidence beyond a reasonable doubt that on December 27, 1921, the witness Irene Michel did deposit in the Night & Day Bank of St. Louis, Missouri, a banking institution doing business in the State of Missouri at the city of St. Louis, $300, or any part thereof, of the value of thirty dollars or more, lawful money of the United States, of the money and property of the witness Irene Michel, and shall further believe from the evidence that the said deposit was not taken and received by the defendant himself, but was taken and received by some other person, but that such person was then and there in the employ of the said Night

& Day Bank of St. Louis, Missouri, and acting under the direction and control of the defendant in said employment, and that such other person had general power and authority from the defendant to receive deposits of money into said bank, and that said bank was then and there insolvent, and the defendant had knowledge that said bank was then and there insolvent, they will find the defendant guilty as charged.

"3.    A bank is insolvent when, from any cause, it is unable to pay its debts in the ordinary or usual course of business.    It is not expected to be able at once to pay every debt it owes, but it must be able to pay or provide for its debts as they fall due in the usual course of business.    'Insolvency,' in the ordinary acceptation of the term, when applied to a bank, means inability to meet liabilities in the usual course of business.

"4.    The court instructs the jury that in determining the condition of the Night & Day Bank of St. Louis, Missouri, on the 27th day of December, 1921, you should consider the reasonable market value of the assets of the bank on hand as compared to its liabilities on that day. All consideration of the condition of the bank is confined to the 27th day of December, 1921, but you may consider any evidence that may be before you showing its condition before that day, if there is any such, to aid you in determining its condition on that day.

"5.    The Jury are instructed that in considering the condition of the bank on the 27th day of December, 1921, you will not take into account the $245,784.68 of capital stock and surplus as a liability.

"6.    The court instructs the jury that if you find and believe from the evidence in the case that at the time the said deposit was made, the said Night & Day Bank was insolvent, but that the defendant had no actual knowledge that the Night & Day Bank was insolvent, then you should find the defendant not guilty.

"The court instructs the jury that the knowledge which the law required the defendant to have had that the said bank was insolvent at the time said deposit was

made, if you find said bank was then insolvent, is actual knowledge, a guilty knowledge that said bank was insolvent at the time said deposit was made.

"7. The court instructs the jury that the guilt of the defendant cannot be presumed, but must be proven by direct or circumstantial evidence. Before you can convict the defendant on circumstantial evidence alone, the facts and circumstances must all form a complete chain, and all point to his guilt, and must be irreconcilable with any reasonable theory of his innocence; and before the jury can convict the defendant on circumstantial evidence alone the circumstances must not only be consistent with his guilt and point directly thereto, but must be absolutely inconsistent with any reasonable theory of his innocence."

On the part of the defendant the court then gave the following instructions:

"8. You are further instructed that the indictment contains the formal statement of the charge, but is not to be taken as any evidence of defendant's guilt.

"The law presumes the defendant to be innocent, and this presumption continues until it has been overcome by evidence which establishes his guilt to your satisfaction and beyond a reasonable doubt; and the burden of proving his guilt rests with the State.

"If, however, this presumption has been overcome by the evidence and the guilt of the defendant established to a moral certainty and beyond a reasonable doubt, your duty is to convict.

"If, upon a consideration of all the evidence, you have a reasonable doubt of the defendant's guilt, you should acquit; but a doubt to authorize an acquittal on that ground ought to be a substantial doubt touching the defendant's guilt, and not a mere possibility of his innocence.

"You are further instructed that you are the sole judges of the credibility of the witnesses and of the weight to be given to their testimony. In determining such credibility and weight you will take into consideration the

character of the witness, his or her manner on the stand, his or her interest, if any, in the result of the trial, his or her relation to or feeling towards the defendant or any other witness in the case, the probability or improbability of his or her statements, as well as the facts and circumstances given in evidence.

"11. The court instructs the jury that before you can convict the defendant the burden is on the State to prove to your satisfaction beyond a reasonable doubt that at the time mentioned in the evidence the Night & Day Bank was insolvent and that defendant knew that said bank was then insolvent, and in this connection you are further instructed that the mere fact, if you find and believe it to be a fact, that the Commissioner of Finance took charge of said bank, closed it and has since had charge and control of its affairs, is not of itself sufficient to prove that said bank was insolvent at the time complained of.

"14. While the court has instructed the jury that the failure of the bank constituted prima-facie evidence of knowledge on the part of defendant that said bank was insolvent, if you find it was insolvent at the time the said deposit was received, yet:

"The court further instructs you that this alone does not overcome the presumption of innocence with which the defendant is clothed and which never shifts, but the presumption of innocence continues throughout the trial and until it is overcome by competent evidence, which proves his guilt to your satisfaction and beyond a reasonable doubt.

"15. The court instructs the jury that under the law, criminal intent is an essential element of the offense wherewith the defendant stands charged, and if the State has failed to prove beyond a reasonable doubt, that the defendant had actual knowledge that said bank was insolvent, if you further find it was insolvent, before and at the time said deposit was made, then no criminal intent has been proven and the defendant should be acquitted.

"16. The court instructs the jury that even though you may find and believe from the evidence in the case, that the Night & Day Bank was insolvent at the time the said deposit was received, still if you further find and believe from the evidence, in the case, that at the time the said deposit described in the indictment was received, the defendant had no actual knowledge that the Night & Day Bank was insolvent, if you find it was insolvent, then the jury should find the defendant not guilty."

I. It is contended that Section 27 of Article XII of our Constitution is not self-executing and that Section 3365, Revised Statutes 1919, "merely reiterates the words of the Constitution; it does not prescribe the nature of the offense as required." It was held in State v. Sattley, 131 Mo. 483, 33 S. W. 41, that the statute "defined the crime to be of the nature of larceny and provided the same punishment therefor . . . So that the nature, the constituents of the crime and the punishment therefor, have been prescribed in said section and the amendments thereto . . . Again, it is said that this section is repugnant to the common-law definition of larceny. If it is meant by this to say that the State of Missouri, through its General Assembly, has not the right or power to declare and punish an act as larceny at common law, then the proposition cannot be countenanced for one moment. The State has the power to define offenses against its dignity and well being and is not in any manner restricted by the common law in this respect. Many of the states have made embezzlement larceny. In Georgia it is denominated larceny after trust. This objection is without merit." The constitutionality of this statute was also affirmed in State v. Darrah, 152 Mo. 522, 54 S. W. 226, and in the very recent opinion by RAILEY, C., State v. Lively, 311 Mo. 414.

II. It is insisted that even if the statute prescribes an offense, the court erred in not sustaining the demurrer to the evidence because: "(a) Proof is that a debt was

created, not the relation of depositor and depositrary.''

The proof is clear that on December 27, 1921, Mrs. Michel made a deposit of $300 in the Night & Day Bank in the usual and ordinary manner of making deposits in banking institutions. Undoubtedly the Night & Day Bank, upon accepting the deposit, became indebted to Mrs. Michel and the relation of debtor and creditor sprang up between them as a result of the deposit, but this did not affect the relation of depositor and depositary. It is difficult to think that learned counsel are serious in this contention. We have read of dialecticians who ''could distinguish and divide, a hair 'twixt north and northwest side.'' If the argument is sound then the framers of our Constitution and our Legislature were laboring under a delusion when they undertook to declare the reception of a deposit by an officer of a bank a felony when it was known to be insolvent. The contention, however, was thoroughly considered and overruled in State v. Lively, supra.

*Debtor and Creditor.*

''(b) No proof that the defendant received any deposit. Indictment charges defendant received and assented to a deposit.'' The proof is that Meininger was cashier and active manager in charge of the bank; that he personally employed tellers to receive deposits and directed and supervised the affairs of the bank. These employees had no experience in bookkeeping; they were ideal accessories if his purpose were to plunder the bank. Every hour that he kept the bank open for the transaction of business he, *ipso facto,* invited its patrons and the public to come in and make deposits with the tellers and assented to every deposit so received by them. *Qui facit per alium facit per se.* In State v. Sattley, supra, (491) BRACE, J., said:

*Acting Through Teller.*

''The defendant argues that to make defendant liable for the reception of the deposit by one of the employees acting under his direction and authority, such authority must have been given after he knew the bank was in failing circumstances. This cannot be true. The moment he became aware the bank was in failing circumstances the

law devolved upon him the duty of revoking the authority of any employee under him and subject to his control to receive any further deposit and his failure to prevent further deposits must be construed as a continuing authority to receive them, and assenting thereto, because by one word it was in his power to close the bank or notify all parties that no more deposits would be received. This was the plain measure of his duty as prescribed by law, which he was conclusively bound to know.''

See 7 Corpus Juris, p. 580, sec. 204, and Kelley's Crim. Law, p. 647, sec. 721.

The felony with which defendant was charged falls within the provisions of Section 3687, Revised Statutes 1919, which reads: ''Every person who shall be a principal in the second degree in the commission of any felony, or who shall be an accessory to any murder or other felony before the fact, shall, upon conviction, be adjudged guilty of the offense in the same degree, and may be charged, tried, convicted and punished in the same manner, as the principal in the first degree.''

''(c) No proof that any assets were not worth amounts set out in daily statement book or inventory made by Commissioner of Finance; no attempt was made to show that any obligors who owed cash items were insolvent.'' The so-called cash items were slips made by tellers, the defendant's tools, at the defendant's directions, showing pretended deposits when in fact no cash was deposited; they were fictitious deposits representing embezzlements made by the defendant. When a slip of this character was made, the cash on hand was correspondingly withdrawn from the bank, because the daily statements of assets included these cash items and the daily statements of assets and liabilities balanced. It required every bona-fide asset of the bank and every one of these fictitious deposits to balance the liabilities of the bank. It is an unavoidable conclusion that Meininger, in the language of the statute, stole the bank's cash to the extent of the fictitious items. His thefts included the large deposits made by the State Treasurer.

*Proof of Worthless Assets.*

On a day in September, 1920, an examination of the bank was impending. Meininger told Schneider, the teller, to charge the cash items, then amounting to $202,571.66, into the individual accounts of depositors. That was done. It wiped out the cash items and on the books of the bank reduced its liabilities to its depositors by the amount of the cash items. This switching was well calculated to deceive the examiners and to tide over the emergency. But it was a confession that the so-called cash items were purely fictitious, because neither bankers nor men in any line of legitimate business charge off solvent assets. Again, on December 17, 1921, an examination was impending. The books had not been made up for a few days. Meininger told Schneider to take the cash items, then amounting to $568,656.66, and charge them to the American Trust Company on the statement book. That process of switching and juggling gave the Night & Day Bank an apparent credit with the Trust Company of $672,000, in round numbers, when its actual deposit was $104,325.03, and wiped out its pretended cash-items account. These pregnant facts were shown by entries in the books of the Night & Day Bank, made under the direction of the defendant ten days before Mrs. Michel made her deposit. It required this fictitious credit with the Trust Company to make the bank's books balance. Conceding that every other item of assets listed in the daily statement was of the value claimed, it is apparent that the defendant had plundered the bank of $568,656.66 of its cash and that it was hopelessly insolvent. The contention that there is "no proof that any assets were not worth the amounts set out in daily statement book or inventory made by Commissioner of Finance" is frivolous. Moreover, the undisputed evidence shows that after falsifying the books of the bank so as to show a large fictitious credit with American Trust Company, the defendant left the bank about midnight on the night of January 3rd, went into hiding, failed to face Ross, the deputy Finance Commissioner, and the bank examiners, who closed the doors of the bank on January 5th,

and was not seen again until some time in March or April following his indictment on February 3, 1922. This unexplained flight was a circumstance the jury might consider, in connection with the other circumstances in the case, as a confession of his guilt. [State v. Meininger, 306 Mo. 690, 268 S. W. 77.] The demurrer was properly overruled.

III. The next assignment of error is that the indictment states no offense, because it is not alleged that the defendant consented to the reception and received a deposit in an insolvent. bank *after* he had knowledge of the insolvency. Stripped of formal averments, the indictment charges that the bank, on the day the deposit was made, was insolvent, as the defendants then and there well knew and that, knowing it was insolvent, they assented to the reception of the deposit and did then and there, etc., receive for, on and as a deposit in the said Night & Day Bank as aforesaid, $300, etc., the money and personal property of Irene Michel, etc. It will be seen the indictment charges that the defendant received and assented to the reception of the deposit. He was convicted of assenting to the reception of the deposit.

Learned counsel for appellant, in their printed argument, thus summarize the averments of the indictment: "That the defendant was a director and officer of the Night & Day Bank, a corporation doing a banking business: That said bank on the date alleged in the indictment was insolvent as the defendant then and there well knew: And that knowing said bank to be insolvent, the defendant assented to the reception of a deposit and received a deposit from the prosecuting witness: There is no averment in the indictment that the defendant had knowledge of the insolvency prior to the assenting and reception of the deposit or that at the time of assenting to or receiving the deposit the defendant then and there knew of its insolvency."

If, at the instant the defendant assented to the reception of the deposit, he knew the bank was insolvent, then he *had* this knowledge prior to giving his assent. The

statute does not require that the knowledge should have been acquired a day or a week or a month before the officer gave his assent. The crime was committed if he *had* the guilty knowledge at the instant he assented to the reception of the deposit. [State v. Sattley, supra.] To contend otherwise is mere hair splitting. The indictment clearly charges a violation of the statute and is sufficient. [State v. Buck, 108 Mo. 625, 181 S. W. 1113, and Judge White's concurring opinion in State v. Lively, supra.]

IV. (a) It is contended the court erred in giving Instruction 4 because there was no evidence of the market value of the bank's assets. The State accepted the valuation placed upon the bank's assets by the defendant. The evidence shows that, accepting these valuations, the defendant had despoiled the bank of its cash assets and that the bank was insolvent at and long prior to the time Mrs. Michel made her deposit. The insolvency of the bank having been shown thus conclusively by the books of the bank, made under defendant's express directions, there was no need of a showing of the market value of the bank's assets. The instruction was therefore harmless.

Market Value.

(b) "Instructions 1 and 6 require knowledge of insolvency at the time, *not before* a deposit is made, and assumes transaction one of deposit while evidence shows creation of a debt." This assignment has been fully considered.

Knowledge.

(c) Appellant contends the court erred in refusing his Instruction 4, to the effect that unless at the time the deposit was received the defendant had the felonious intent to steal the deposit and that he did steal it, the jury should acquit the defendant. This instruction was properly refused. The defendant was not charged with common-law larceny, but with a felony denounced by the statute as larceny, "and upon conviction thereof shall be punished in the same manner and to the same extent as is provided by law for stealing

Intent to Steal.

the same amount of money deposited or valuable thing.''
[Sec. 3365, R. S. 1919; State v. Sattley, supra.]

V.   Error is assigned in the giving of Instruction 3
defining insolvency.   This instruction was approved in
State v. Burlingame, 146 Mo. 227, 48 S. W. 72, and State
v. Darrah, 152 Mo. 539, 54 S. W. 226.   But, if we concede
the correctness of the defendant's theory that the bank
**Insolvency.** was solvent if its assets were sufficient to meet
its liabilities, it must be admitted that from
the showing made by the bank's books the so-called cash
items were purely fictitious, and if its bona-fide assets
were of the values claimed by the defendant, on any
theory, the bank was insolvent.   In that view, the instruc-
tion, even if wrong, which is not conceded, was harmless.

VI.   It is said the court erred in instructing the jury
that the failure of the bank constituted prima-facie evi-
dence of knowledge on the part of defendant that the
bank was insolvent, if you find it was insolvent at the
time the deposit was received.   A careful reading of the
instructions fails to show that the court gave
**Failure** such an instruction for the State.   This was
**Evidence**
**of Knowledge.** assumed in the defendant's Instruction 14,
where the court correctly told the jury that
such presumption does not overcome the presumption of
innocence with which the defendant is clothed and which
never shifts until it is overcome by competent evidence
which proves his guilt beyond a reasonable doubt.   This
instruction was approved in State v. Burlingame, supra,
l. c. 227; State v. Darrah, supra; State v. Munroe, 273
Mo. 341, 201 S. W. 102, and State v. Creeley, 254 Mo. 386,
162 S. W. 737.   Defendant's refused instructions were
fully covered by those given for the State and for the de-
fendant.

VII.   We have carefully considered errors assigned
in overruling the motion to quash the indictment; it was

properly overruled. There was no prejudicial error in the admission or exclusion of the evidence. The evidence of defendant's guilt was clear and conclusive; the defendant did not testify nor offer any evidence to refute that offered by the State. The evidence fully warranted the verdict rendered by the jury. The punishment assessed was well within the limit authorized by the statute for grand larceny and shows no indication of passion or prejudice on the part of the jury. The case was well tried and was submitted to the jury on instructions upon all questions of law arising in the case and necessary for their information in giving their verdict. The judgment, therefore, is affirmed. *Railey, C.,* concurs.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.